Eric **WALDBAUM**, Appellant,

v.

**FAIRCHILD PUBLICATIONS, INC.**

No. 79–1407.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 9, 1980.

Decided March 31, 1980.

Certiorari Denied Oct. 14, 1980.

See 101 S.Ct. 266.

Lowell D. Turnbull, with whom Richard P. Shlakman, Washington, D. C., was on brief, for appellant.

Henry J. Formon, Jr., New York City, for appellee.

Before TAMM and MacKINNON, Circuit Judges, and HAROLD H. GREENE,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In this action we must determine when an individual not a public official has left the relatively safe harbor that the law of defamation provides for private persons and has become a public figure within the meaning of the Supreme Court's decision in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). After examining affidavits and exhibits submitted by the parties, Judge Howard F. Corcoran of the United States District Court for the District of Columbia concluded that the plaintiff was a limited public figure under *Gertz.* Because the plaintiff admitted that he could not prove "actual malice" on the part of the defendant, which *Gertz* requires public figures to do, Judge Corcoran entered summary judgment for the defendant. Having reviewed the facts in light of the criteria that govern the status of a defamation plaintiff, we agree with Judge Corcoran's decision and affirm.

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

## I.

Although the parties in this case differ over how to classify the plaintiff, they fundamentally agree on the underlying facts. Eric Waldbaum, the plaintiff, became president and chief executive officer of Greenbelt Consumer Services, Inc. (Greenbelt) in January of 1971. Greenbelt is a diversified consumer cooperative that, during Waldbaum's tenure, ranked as the second largest cooperative in the country.[1]

While serving as Greenbelt's president, Waldbaum played an active role not only in the management of the cooperative but also in setting policies and standards within the supermarket industry. He battled the traditional practices in the industry and fought particularly hard for the introduction of unit pricing and open dating in supermarkets.[2] He held several meetings, to which press and public were invited, on topics varying from supermarket practices to energy legislation and fuel allocation. He pursued a vigorous policy of consolidating Greenbelt's operations to eliminate unprofitable outlets. These actions generated considerable comment on both Greenbelt and Waldbaum in trade journals and general-interest publications.[3]

On March 16, 1976, Greenbelt's board of directors dismissed Waldbaum as the cooperative's president and chief executive officer. *Supermarket News*, a trade publication owned by the defendant, Fairchild Publications, Inc. (Fairchild),[4] ran an item on Waldbaum's ouster on page 35 of its March 22 issue. The five-sentence article stated at one point that Greenbelt "has been losing money the last year and retrenching." Supplemental Appendix (Supp. App.) at 328.[5]

On September 27, 1976, Waldbaum filed a libel action in the district court based upon this comment in the article.[6] He contended that in fact Greenbelt had not been losing money or retrenching and that this allegedly false report damaged his reputation as a businessman. Waldbaum sought actual and exemplary damages totalling $75,000.

After discovery, Fairchild moved for summary judgment. It argued that Waldbaum was a public figure and, because he had admitted the absence of "actual malice," he could not recover damages for defamation. Waldbaum countered that he was

---

1. When Waldbaum left as Greenbelt's president, the cooperative had approximately 38,500 members. The company owns retail supermarkets (Co-op Supermarkets), furniture and gift outlets (SCAN stores), and automobile service stations (Exval stations).

2. Waldbaum had been a leading advocate of unit pricing when he was a vice-president of Hill's Supermarkets in New York. *See* Supplemental Appendix (Supp.App.) at 320.

3. The defendant, Fairchild Publications, Inc., appended 31 newspaper clippings from its trade publication, *Supermarket News*, and from *The Washington Post* to its motion for summary judgment. Of these, 22 appeared while Waldbaum was president (or in conjunction with his hiring and termination); 10 of them mentioned Waldbaum by name in connection with his becoming and leaving as president, Greenbelt's financial status, the cooperative's criticisms of competitors in advertising, and its effort to enter into oil exploration. *See* Appendix (App.) at 83–126; Supp.App. at 316–31.

4. Capital Cities Media, Inc., a wholly owned subsidiary of Capital Cities Communications, Inc., succeeded Fairchild by merger in 1976.

For convenience, however, we shall refer to the defendant as "Fairchild."

5. The story in its entirety read:
   GREENBELT OUSTS ERIC WALDBAUM
       WASHINGTON (FNS)—Eric Waldbaum has been replaced as president of Greenbelt Consumer Services.
       Rowland Burnstan will serve as acting chief executive office[r] until a new president is named. Burnstan, an independent management consultant and economist, has worked for various Government agencies and businesses.
       Greenbelt said part of his interim job will be to locate a new president for the co-op, which has been losing money the past year and retrenching.
       Waldbaum had served as president since 1971. His plans are not known.
   Supp.App. at 328.

6. Waldbaum originally included Greenbelt and one of its directors, Bruce D. Patner, as defendants. At Waldbaum's request, however, the district court dismissed with prejudice the counts against Greenbelt and Patner on March 28, 1977.

not a public figure and thus would have to prove only negligence on the part of Fairchild in researching and publishing the article. On February 15, 1979, Judge Corcoran granted Fairchild's motion. He concluded that although Waldbaum could not be considered a public figure for all purposes, he was a public figure for the limited range of issues concerning "Greenbelt's unique position within the supermarket industry and Waldbaum's efforts to advance that position." *Waldbaum v. Greenbelt Consumer Services, Inc.*, Civ.No. 76–1810, at 15 (D.D.C. Feb. 15, 1979) (memorandum and order granting Fairchild's motion for summary judgment), *reprinted in* Appendix (App.) at 150, 164. Waldbaum now appeals.[7]

## II.

In the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that certain rules of law historically applied in defamation cases impinge upon the first amendment's guarantee of freedom of the press. Specifically, the Court announced that a public official may not recover in a defamation action absent a showing "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726. Subsequently, the Court applied the same standard to public figures. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

These rulings balance the competing interests of the public, the press, and the individual. From its earliest days, the law of defamation made the individual's interest in his reputation supreme. Beginning with *New York Times*, however, the Court

recognized the hard reality that society must afford a certain amount of "strategic protection" to defamatory statements to avoid chilling the dissemination of truth and opinions. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 342, 94 S.Ct. at 3008. Thus, these decisions do not insulate the defamer because of the value of his message as such. Rather, they give the media "breathing space" to ensure "that debate on public issues [is] uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. at 270, 272, 84 S.Ct. at 721, while accommodating the conflicting need of the individual to redress wrongful injury to his reputation. *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 2687, 61 L.Ed.2d 411 (1979); *Gertz v. Robert Welch, Inc.*, 418 U.S. at 342, 94 S.Ct. at 3008.

In *Gertz*, decided in 1974, the Court focused on the public or private status of the plaintiff in determining how to protect simultaneously individual reputation, freedom of the press, and public debate. It found that a private individual has little means of redressing a defamatory statement except by legal action. *See id.* at 344, 94 S.Ct. at 3009. It therefore held that a state may allow a private person to recover for defamation under any standard, as long as that standard does not impose liability without fault. *Id.* at 347, 94 S.Ct. at 3010.

This balance shifts, however, when one turns from private persons to public officials or figures. First, those who enter the public spotlight have greater access to the media to correct misstatements about them, as shown by their preexisting media exposure. *Id.* at 344, 94 S.Ct. at 3009.[8] More important, in "assum[ing] special prominence in the resolution of public questions," *id.* at 351, 94 S.Ct. at 3013, public figures

---

**7.** Fairchild concedes that Judge Corcoran was correct in ruling that Waldbaum was not a public figure for all purposes. It argues before us that Waldbaum was a public figure for limited purposes that include the statements made in the March 22, 1976, article.

**8.** Having access to the press does not always alleviate the injury caused by defamation. The Court in *Gertz* stated:

Of course, an opportunity for rebuttal seldom suffices to undo the harm of defamatory falsehood. Indeed, the law of defamation is rooted in our experience that the truth rarely catches up with a lie. But the fact that the self-help remedy of rebuttal, standing alone, is inadequate to its task does not mean that it is irrelevant to our inquiry.

418 U.S. at 344 n.9, 94 S.Ct. at 3009 n.9.

"invite attention and comment," *id.* at 345, 94 S.Ct. at 3009. They thus accept the risk that the press, in fulfilling its role of reporting, analyzing, and commenting on well-known persons and public controversies, will focus on them and, perhaps, cast them in an unfavorable light. *See id.* at 344–45, 94 S.Ct. at 3009.[9] Although these generalities may not fit every situation exactly, they draw a relatively clear line for the press to follow. *See id.* at 345, 94 S.Ct. at 3009.[10]

In trying to define who is a public figure, the Court in *Gertz* created two subclassifications, persons who are public figures for all purposes and those who are public figures for particular public controversies. An individual may have attained a position "of such persuasive power and influence," *id.*, and of "such pervasive fame or notoriety," *id.* at 351, 94 S.Ct. at 3013, that he has become a public figure in all situations. This test is a strict one. The Court stated flatly that "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Id.* at 352, 94 S.Ct. at 3013. *Accord, Wolston v. Reader's Digest Association,* 443 U.S. 157, 165, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979).

The Court in *Gertz* acknowledged freely that under this definition the general public figure is a rare creature. More common are persons who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." 418 U.S. at 345, 94 S.Ct. at 3009. Put slightly differently, this limited-purpose public figure is "an individual [who] voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues." *Id.* at 351, 94 S.Ct. at 3013. The relevant examination turns on

"the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013.

## III.

■ Unfortunately, the Supreme Court has not yet fleshed out the skeletal descriptions of public figures and private persons enunciated in *Gertz*. The very purpose of the rule announced in *New York Times*, however, requires courts to articulate clear standards that can guide both the press and the public. From analyzing *Gertz* and more recent defamation cases, we believe that a person can be a general public figure only if he is a "celebrity"—his name a "household word"—whose ideas and actions the public in fact follows with great interest. We also conclude that a person has become a public figure for limited purposes if he is attempting to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants. In undertaking this examination, a court must look through the eyes of a reasonable person at the facts taken as a whole.

### A.

The Supreme Court acknowledged in *Gertz* that the peculiar circumstances of each case affect the balance between freedom of the press and an individual's interest in his reputation. *See* 418 U.S. at 343, 94 S.Ct. at 3008. The Justices nevertheless eschewed analyzing a person's status as a public figure case by case: a purely ad hoc approach, though perhaps more accurate in its final outcome, "would lead to unpredictable results and uncertain expectations . . . ." *Id.* Instead, courts should formulate "broad rules of general application" that accommodate the competing interests

---

**9.** The Court in *Gertz* stated that, at least in theory, a person can become a public figure involuntarily. Such instances, the Court nevertheless noted, are rare. *See id.* at 345, 94 S.Ct. at 3009. For a discussion of involuntary public figures, see note 18 *infra*.

**10.** For a discussion of the importance of how clearly this line is drawn, see pp. 1292–1293 *infra*.

of press and personal reputation. *Id.* at 343–44, 94 S.Ct. at 3008–3009. Of course, litmus tests that define what is and is not protected and that the press, the public, and the courts could apply with perfect consistency and accuracy would reduce the need for the "breathing space" that *New York Times* creates. Unfortunately, we do not have such tests. Until we find them, we must search for more precise articulations of all aspects of the *New York Times* rules, realizing that the more certain our determinations become the less need there is to extend first amendment safeguards to matters that do not merit those safeguards on their own account.

Clear guidelines are important, first, for the press. As noted above, the entire scheme of "strategic protection" for certain defamatory statements rests not on the inherent value of those statements but instead on the need to avoid chilling the dissemination of information and ideas that are constitutionally protected for their own sake. *See* p. 1291 *supra.* Because the outcome of future litigation is never certain, members of the press might choose to err on the side of suppression when trying to predict how a court would analyze a news story's first amendment status. Questionable areas thus receive prophylactic protection to ensure that the press will not refrain from publishing material that has value under the first amendment due to its own content.

Precision also is important to members of the public generally, any one of whom might become the subject of a press defamation. Our society always has encouraged citizen involvement in public affairs. The

fear of no redress for injury to reputation may deter an individual from engaging in some course of conduct that a court later might find to have altered his status.[11] Similarly, a person desiring to voice his views on public issues may not wish to have some aspects of his private life exposed and therefore may refrain from entering the public arena. To guard against these possibilities, society must provide the individual with clear rules that govern the potential consequences of his participation in public life. Clarity allows him to calculate correctly, and not overestimate or underestimate, the effect that undertaking some activity will have on the legal recourse available to him should he suffer injury due to defamation by the press.

### B.

Given these considerations, a court[12] analyzing whether a given plaintiff is a public figure must look at the facts, taken as a whole, through the eyes of a reasonable person. This objective approach should enable both the press and the individual in question to assess the individual's status, in advance, against the same yardstick. Focusing on what a reporter, editor, or publisher actually knew or believed could introduce subjective elements that are difficult to prove and even more difficult to predict. Such a perspective would give the individual little opportunity to alter his conduct or lifestyle to preserve his anonymity. Similarly, looking only to what the individual thought would charge the press with discovering and evaluating the inner beliefs and peculiarities of particular individuals

11. As the Supreme Court observed in *Gertz*, "We [should] not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes." 418 U.S. at 352, 94 S.Ct. at 3013. Democracies should avoid deterring citizen involvement in public affairs. *Gertz* implicitly furthers this policy by making public figures only those who are extraordinarily prominent and pervasively involved in public matters or who, in particular instances, have become integrally involved in the disposition of particular public controversies—and then only for purposes related to those controversies. *See gen-*

*erally* Note, *An Analysis of the Distinction Between Public Figures and Private Defamation Plaintiffs Applied to Relatives of Public Persons*, 49 S.Cal.L.Rev. 1131, 1199–200 (1976); 48 Temp.L.Q. 450, 460 (1975).

12. Whether the plaintiff is a public figure is a question of law for the court to resolve. *Wolston v. Reader's Digest Ass'n*, 578 F.2d 427, 429 (D.C.Cir.1978), *rev'd on other grounds*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). *See Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966).

and thus would deprive the media of the very "breathing space" that *New York Times* sought to create and protect. Resolving these questions based upon what a reasonable person, looking at the entire situation, would conclude allows the press and the individual to evaluate public-figure status against a single, discoverable norm and from there to act as they see fit, understanding the consequences of their conduct under *New York Times*.[13]

## C.

With this background, we turn to the standards themselves for determining when a person is a public figure. A court first must ask whether the plaintiff is a public figure for all purposes. *Gertz*, as noted above, held that a plaintiff could be found to be a general public figure only after a clear showing "of general fame or notoriety in the community, and pervasive involvement in the affairs of society . . . ." 418 U.S. at 352, 94 S.Ct. at 3013. He must have assumed a "role of especial prominence in the affairs of society. . . ." *Time, Inc. v. Firestone*, 424 U.S. 448, 453, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). *Accord, Wolston v. Reader's Digest Association*, 443 U.S. 157, 165, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979). In other words, a general public figure is a well-known "celebrity," his name a "household word."[14] The public recognizes him and follows his words and deeds, either because it regards his ideas, conduct, or judgment as worthy of its attention or because he actively pursues that consideration.[15]

As a general rule, a person who meets this test has access to the media if defamed. The public's proven preoccupation with him indicates that the media would cover such an individual's response to statements he believes are inaccurate or unsupported.[16] In general, too, the person has assumed the risk that public exposure might lead to misstatements about him. Famous persons may not have submitted voluntarily to a loss of reputation as such. Nevertheless, their renouncement of anonymity or tolerance of publicity unavoidably carries with it the possibility that the press, in fulfilling its role of reporting and critiquing matters of public concern, may investigate their talents, character, and motives. The media serve as a check on the power of the famous, and that check must be strongest when the subject's influence is strongest.[17] Fame often brings power, money, respect, adulation, and self-gratification. It also may bring close scrutiny that can lead to adverse as well as favorable comment. When someone steps into the public spotlight, or when he remains there once cast

---

**13.** *Cf.* Note, *supra* note 11, at 1204–05 (plaintiff is a public figure when he *appears* prominent). *See also Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3010 ("media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk").

**14.** *See* Robertson, *Defamation and the First Amendment: In Praise of* Gertz v. Robert Welch, Inc., 54 Tex.L.Rev. 199, 222–23 (1976); Note, *supra* note 11, at 1209.

**15.** In many instances, of course, the public may accord a person a degree of respect that a reasonable person—or judge—might believe is undeserved. This assessment, however, is not material to the issue before the court. Instead, the proper question is whether a reasonable person would conclude that, in fact, the public pays him heed.

In this vein, we note that many well-known athletes, entertainers, and other personages en-

dorse commercial products, publicly support political candidates, or take open stands on public issues. This phenomenon, regardless of whether it is justified, indicates that famous persons may be able to transfer their recognition and influence from one field to another. At the very least, businessmen and politicians are willing to stake substantial funds on the effectiveness of this form of advertising. A person's power to capitalize on his general fame by lending his name to products, candidates, and causes indicates the broad influence he has. The ability to affect a variety of areas makes close scrutiny in the press especially appropriate, in particular to educate the public on the famous person's actual expertise with reference to whom or what he is promoting.

**16.** Note, *supra* note 11, at 1210.

**17.** *See* Robertson, *supra* note 14, at 225–26.

into it, he must take the bad with the good.[18]

██ In determining whether a plaintiff has achieved the degree of notoriety and influence necessary to become a public figure in all contexts, a court may look to several factors.[19] The judge can examine statistical surveys, if presented, that concern the plaintiff's name recognition.[20] Previous coverage of the plaintiff in the press also is relevant. The judge can check whether others in fact alter or reevaluate their conduct or ideas in light of the plaintiff's actions. He also can see if the plaintiff has shunned the attention that the public has given him and determine if those efforts have been successful.[21] At all times, the judge should keep in mind the voluntariness of the plaintiff's prominence and the availability of self-help through press coverage of responses—in other words, whether the plaintiff has assumed the risk of reputational injury and whether he has access to the media. No one parameter is dispositive; the decision still involves an element of judgment. Nevertheless, the weighing of these and other relevant factors can lead to a more accurate—and a more predictable—assessment of a person's overall fame and notoriety in the community.[22]

18. In rare instances, a celebrity may decide to abandon his prominent position in society to return to anonymity, but persistent press attention, most likely fueled by continuing public interest, may thwart his quest for privacy. In such a case, he still may be a public figure. Although he no longer is accepting the risk of defamation voluntarily, he remains able to reply to attacks through the press, which is continuing to cover him. Because he irretrievably has lost his anonymity, potential damage to reputation poses a small incremental danger. *See* Note, *supra* note 11, at 1210, 1219. Moreover, his power and influence, due to his prominence, may continue despite his efforts to renounce *publicity. Thus, his actions still, as Gertz* put it, "invite attention and comment." 418 U.S. at 345, 94 S.Ct. at 3009. Media scrutiny remains appropriate and necessary to balance his undesired but nonetheless real impact on the affairs of society. *Gertz* itself acknowledged that such a situation might arise. *See id.* (recognizing the existence, at least in theory, of "involuntary public figures").

19. The court must examine these factors as they existed before the defamation was published. Otherwise, the press could convert a private individual into a general public figure simply by publicizing the defamation itself and creating a controversy surrounding it and, perhaps, litigation arising out of it. *See Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) ("those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure"). This perspective also ensures that the press and the individual can analyze the latter's status before the defamation, thereby enabling them to take steps they deem appropriate to investigate further (in the case of the media) or to renounce public involvement (in the case of the individual). *See* pp. 1292–1293 *supra.*

20. *E. g.* Robertson, *supra* note 14, at 224. We do not believe that the Supreme Court, in employing the phrase *"general* fame or notoriety" in *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013 (emphasis added), necessarily meant that a majority or more of the public must know of the plaintiff. Rather, we conclude that "general" fame means being known to a large percentage of the well-informed citizenry.

In *Gertz* the Court remarked, "None of the prospective jurors called at the trial had ever heard of petitioner prior to this litigation, and respondent offered no proof that this response was atypical of the local population." *Id.* We do not believe that this passing observation was intended to encourage polling jurors or veniremen to gauge a plaintiff's general fame or anonymity. Because of its small size and the non-random elements that go into its selection, we doubt that in most cases a jury would be a statistically reliable sample representative of the general population. The question is whether such a poll would be relevant—*i. e.,* probative—evidence admissible on this issue.

21. Simply announcing that one no longer desires press coverage and then refusing to grant interviews may not be enough. A person who takes these steps may be continuing in a career that captivates the public, be it in politics, business, the arts, sports, or entertainment. Because public interest in him persists and because he has chosen to occupy a position that places him in the spotlight and thereby may make him influential, he retains his access to the media and has invited continued attention and comment. *See Chuy v. Philadelphia Eagles Football Club*, 431 F.Supp. 254, 267 (E.D. Pa.1977), *aff'd,* 595 F.2d 1265 (3d Cir. 1979) (en banc). *See also* note 18 *supra* (involuntary public figures); note 36 *infra* (position conferring public-figure status).

22. In examining the status of the plaintiff in *Gertz*, the Court noted that he had "no general fame and notoriety *in the community"* and *that he was not generally known to "the local*

#### D.

Few people, of course, attain the general notoriety that would make them public figures for all purposes. Nevertheless, many persons "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3009. Thus, even if a court finds that a plaintiff is not a general public figure, it still must examine "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013.

■ As the first step in its inquiry, the court must isolate the public controversy. A public controversy is not simply a matter of interest to the public; it must be a real

dispute, the outcome of which affects the general public or some segment of it in an appreciable way. The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. *Time, Inc. v. Firestone*, 424 U.S. 448, 454–55, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154 (1976).[23] Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.

■ Courts must exercise care in deciding what is a public controversy. Newsworthiness alone will not suffice, for the alleged defamation itself indicates that someone in the press believed the matter deserved media coverage.[24] Moreover, a

---

population." 418 U.S. at 351–52, 94 S.Ct. at 3012–3013 (emphasis added). We therefore conclude that nationwide fame is not required. Rather, the question is whether the individual had achieved the necessary degree of notoriety where he was defamed—*i. e.*, where the defamation was published.

Dissemination to a wide audience creates special problems. For example, an individual may be well known in a small community, but the publication covers a larger area. In such a situation, it might be appropriate to treat the plaintiff as a public figure for the segment of the audience to which he is well known and as a private individual for the rest. In any event, the defamation's audience may be relevant in assessing damages, for injury may be less if the audience does not know of the victim and will have no occasion to interact with him in the future.

23. *Firestone* involved a national newsmagazine's allegedly defamatory report of divorce proceedings between the heir to the Firestone tire fortune and his socially prominent wife. The Court first rejected the contention that Mrs. Firestone was a general public figure. 424 U.S. at 453, 96 S.Ct. at 964. It then stated:

Dissolution of a marriage through judicial proceedings is not the sort of "public controversy" referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public. Nor did [Mrs. Firestone] freely choose to publicize issues as to the propriety of her married life.

*Id.* at 454, 96 S.Ct. at 965. We read these remarks as meaning that matters essentially of a private nature do not become public controversies solely because members of the public find them appealing to their "morbid or pru-

rient curiosity." Eaton, *The American Law of Defamation Through* Gertz v. Robert Welch, Inc. *and Beyond: An Analytical Primer*, 61 Va. L.Rev. 1349, 1446 (1975). Disputes of this nature, in addition, generally do not have appreciable consequences for nonparticipants. *See* pp. 1296–1298, *infra*.

Likewise, publicity surrounding litigation does not by itself elevate the parties to public figures, even if they could anticipate the publicity, unless they are using the court as a forum for espousing their views in other controversies. *Wolston v. Reader's Digest Association*, 443 U.S. 157, 167–69, 99 S.Ct. 2701, 2707–08, 61 L.Ed.2d 450 (1979); *Time, Inc. v. Firestone*, 424 U.S. at 455–57, 96 S.Ct. at 965–66. Nevertheless, litigation itself can become controversial. For example, the public might debate the prosecutor's use of his discretion in bringing particular criminal charges or the judge's conduct of the proceedings. In these instances, however, the controversy is not the matter being litigated. Parties to the original court action could become embroiled in the public controversy so much that they become public figures for that controversy; it is also possible that they will take no part in that debate. Refusing to make participation in publicized litigation a sufficient condition for becoming a public figure has salutary policy effects, for it avoids deterring either resort to the courts to settle disputes when one believes he has been wronged or active defense when he believes he has been accused of some civil or criminal misconduct unjustifiably.

24. Kalven, *The Reasonable Man and the First Amendment: Hill, Butts, and Walker*, 1967 Sup.Ct.Rev. 267, 284. *See Wolston v. Reader's Digest Association*, 443 U.S. 157, 167, 99 S.Ct. 2701, 2708, 61 L.Ed.2d 450 (1979).

court may not question the legitimacy of the public's concern; such an approach would turn courts into censors of "'what information is relevant to self-government.'" *Gertz v. Robert Welch, Inc.*, 418 U.S. at 346, 94 S.Ct. at 3010 (quoting *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 79, 91 S.Ct. 1811, 1837, 29 L.Ed.2d 296 (1971) (Marshall, J., dissenting)). *Accord, Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S.Ct. 958, 964, 47 L.Ed.2d 154 (1976).[25] A vital part of open public debate is deciding what should be debated. No arm of the government, including the judiciary, should be able to set society's agenda.[26] Thus, courts must look to what already were disputes. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979).

To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question.[27] A general concern or interest will not suffice. *Id.* The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.[28] It should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.[29] If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

■ Once the court has defined the controversy, it must analyze the plaintiff's role in it. Trivial or tangential participation is not enough. The language of *Gertz* is clear that plaintiffs must have "thrust themselves to the forefront" of the controversies so as to become factors in their ultimate resolution. 418 U.S. at 345, 94 S.Ct. at 3009. They must have achieved a "special prominence" in the debate. *Id.* at 351, 94 S.Ct. at 3012. The plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution.[30] In undertaking this analysis, a court can look to the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct and statements. *See* pp.

---

**25.** As the Supreme Court wrote 40 years ago, "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940). The controversy need not concern political matters. In a case that involved a defamation action brought by a professional athlete, one court observed:

> We obviously cannot say that the public's interest in professional football is important to the commonweal or to the operation of a democratic society in the same sense as are political and ideological matters. However, the fabric of our society is rich and variegated. . . . [I]nterest in professional football must be deemed an important incident among many incidents, of a society founded upon a high regard for free expression.

*Chuy v. Philadelphia Eagles Football Club*, 431 F.Supp. 254, 267 (E.D.Pa.1977), *aff'd*, 595 F.2d 1265 (3d Cir. 1979) (en banc). *Cf.* Ingber, *Defamation: A Contest Between Reason and Decency*, 65 Va.L.Rev. 785, 841–42 (1979) (fearing that *Gertz* leaves little room for debate of matters other than "mainstream issues").

**26.** Ingber, *supra* note 25, at 836–42.

**27.** We do not believe it necessary to state that a court should define the controversy "narrowly" or "broadly." A narrow controversy will have fewer participants overall and thus fewer who meet the required level of involvement. A broad controversy will have more participants, but few can have the necessary impact. Indeed, a narrow controversy may be a phase of another, broader one, and a person playing a major role in the "subcontroversy" may have little influence on the larger questions or on other subcontroversies. In such an instance, the plaintiff would be a public figure if the defamation pertains to the subcontroversy in which he is involved but would remain a private person for the overall controversy and its other phases.

**28.** The public need not be the immediate decisionmaker, for in a democracy the people should be well informed on issues to be decided, at least directly, by their representatives. *See also* note 25 *supra*.

**29.** Note, *supra* note 11, at 1215.

**30.** *Id.* at 1210–11.

1295–1296 *supra.*[31] *See generally Rosanova v. Playboy Enterprises, Inc.,* 411 F.Supp. 440, 445 (S.D.Ga.1976), *aff'd,* 580 F.2d 859 (5th Cir. 1978).[32]

■ Finally, the alleged defamation must have been germane to the plaintiff's participation in the controversy. His talents, education, experience, and motives could have been relevant to the public's decision whether to listen to him.[33] Misstatements wholly unrelated to the controversy, however, do not receive the *New York Times* protection.

■ Those who attempt to affect the result of a particular controversy have assumed the risk that the press, in covering the controversy, will examine the major participants with a critical eye. Occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome. Unless he rejects any role in the debate, he too has "invited comment" relating to the issue at hand. In any event, media coverage of the controversy can be expected to include reports on a major participant's reply to mis-

statements made about him.[34] In short, the court must ask whether a reasonable person would have concluded that this individual would play or was seeking to play a major role in determining the outcome of the controversy and whether the alleged defamation related to that controversy.

### IV.

■ With the foregoing analysis in mind, we now must determine whether Judge Corcoran correctly concluded that Waldbaum was a public figure. As noted above, Fairchild concedes that he was not a general-purpose public figure, and Waldbaum concedes that he cannot prove "actual malice" within the meaning of *New York Times.* Thus, if we agree with Judge Corcoran that Waldbaum was a limited-purpose public figure and that Fairchild's alleged defamation fell within the relevant range of issues, we must affirm the grant of summary judgment. After examining the facts, we do agree and, therefore, affirm.

Evidence submitted with Fairchild's motion for summary judgment indicates clear-

31. Responding to press inquiries or attempting to reply to comments on oneself through the media does not necessarily mean that a person is attempting to play a significant role in resolving a controversy. *See Time, Inc. v. Firestone,* 424 U.S. 448, 454 n.3, 96 S.Ct. 958, 965 n.3, 47 L.Ed.2d 154 (1976).

32. At first glance, it may seem anomalous that a person who falls slightly short of the general fame required to be a general public figure but who is not involved in any particular public controversy is a private person, while a citizen who becomes influential in a single issue is a limited-purpose public figure. We believe that this result is correct and consistent with the principles underlying *New York Times* and *Gertz.* The limited public figure by definition is playing or attempting to play a major role in influencing one aspect of society. A well-known celebrity becomes a public figure because the press must be entitled to presume that persons to whom the general public pays close attention have substantial influence over a multitude of areas, *see* note 15 *supra,* and thus may play some role in their outcome. The person who lacks the level of recognition to be classified as a general public figure no longer can be assumed to have pervasive influence in society. Thus, we must return to a more particularized inquiry into the circumstances of his

case. If in fact he is shaping or is trying to shape the outcome of a specific public controversy, he is a public figure for that controversy; if not, he remains a private individual.

33. *See* Restatement (Second) of Torts § 580A (1977) (public figure's "conduct, fitness or role"). In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), decided shortly after *New York Times,* the Supreme Court remarked:

> The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.

*Id.* at 77, 85 S.Ct. at 217, *quoted in part in Gertz v. Robert Welch, Inc.,* 418 U.S. at 344–45, 94 S.Ct. at 3009.

34. *See* Note, *supra* note 11, at 1219. Correcting inaccurate media reports about oneself does not by itself prove access or public-figure status. *See* note 31 *supra.*

ly that Greenbelt was an innovative company often the subject of news reports. As the second largest cooperative in the nation it attracted attention, and its pathbreaking marketing policies—*e. g.*, unit pricing, open dating, and highly competitive advertising—became the subject of public debate within the supermarket industry and beyond, debate that would affect consumers and retailers in the Washington area and, perhaps, elsewhere. We therefore believe that, before *Supermarket News* published its story about Waldbaum's dismissal, public controversies existed over the viability of cooperatives as a form of commercial enterprise and over the wisdom of various policies that Greenbelt in particular was pioneering.

With some admittedly overlapping controversies identified, we now must examine Waldbaum's role in them. Waldbaum was known as a leading advocate of certain precedent-breaking policies before coming to Greenbelt. *See, e. g., Eric Waldbaum*

*New Head at Greenbelt*, Supermarket News, Jan. 4, 1971, at 4, col. 1, *reprinted in* Supp.App. at 320. He has admitted that as president and chief executive officer, he pursued these policies and other consumer-oriented activities. App. at 58–59 (deposition of Waldbaum). He felt that educating the community at large was one function of a cooperative such as Greenbelt. *Id.* at 56.[35] Greenbelt published its own monthly newspaper, *Co-op Consumer*, and Waldbaum "insisted" that he, as president, approve all information placed in it for the shareholders. *Id.* at 48.

■ Being an executive within a prominent and influential company does not by itself make one a public figure. In many cases, a corporate official is simply a conduit for announcing and administering company policies made by others. Similarly, many executives who do make corporate policy do not thereby take stands in public controversies.[36] These descriptions, how-

**35.** We quote from Waldbaum's deposition:

I spent a great deal of my time at the Cooperative in dealing with the membership, its Congress, its area councils, on questions of how they could make input into the Cooperative consistent with managing the business in a way which would inure to the benefit of all its shareholders. *I went out of my way to solicit and promote involvement of its membership.* I don't know how you weigh what a statement means, that it is the most important aspect.

App. at 55 (emphasis added).

Well, in a typical organization that is involved solely with—its shareholders are concerned only with the performance of the corporation for its shareholder interests, the consumer cooperative, *and particularly Greenbelt, has considered itself as having an obligation to education in the community at large* ; witness the involvements of its member relations department. So that much of my time was spent—much of the time of members of my staff would be spent—on things that might not inure to the earnings or to shareholder equity but were done to teach and educate people about consumers and cooperatives and their rights—a very, very different kind of approach—so that *I really had two full time jobs, not only managing a corporation in all of its aspects but also this tremendous social outreach.*

*Id.* at 56–57 (emphasis added).

. .. . I was hired as the chief executive officer of the Coop to do a job that included a

broad scope of things. That is why I couldn't answer your first question, what does it mean to—what do you do when you are the president? You do everything. You are responsible for the day-to-day management of a company. *You are responsible for its public image.* To me, *I felt as strongly about the consumer aspects of Greenbelt, and I think that the Coop's livelihood depended on the promulgation of the consumer aspects*, which is why I spent so much time on it.

I think that they went hand in hand. I don't know what commercial aspects might be, but I considered myself performing all of the duties for which I was hired, capable of performing them and capable of serving as a chief executive officer *in today's climate when questions about the social commitment of corporations are prime issues and prime concerns*, and not just looking at questions of the balance sheet.

*Id.* at 58 (emphasis added).

**36.** Sometimes position alone can make one a public figure. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967) (plurality opinion of Harlan, J.); *Chuy v. Philadelphia Eagles Football Club*, 431 F.Supp. 254, 267 (E.D.Pa.1977), aff'd, 595 F.2d 1265 (3d Cir. 1979) (en banc). The position itself may be so prominent that any occupant unavoidably enters the limelight and thus becomes generally known in the community—a general public figure. Similarly, the

ever, do not fit Eric Waldbaum at Greenbelt. His own deposition indicates that he was the mover and shaper of many of the cooperative's controversial actions. He made it a leader in unit pricing and open dating. He supervised, or at least approved, the consumer-oriented views that appeared in *Co-op Consumer*. In short, as Judge Corcoran so aptly put it, "he did not become merely a boardroom president whose vision was limited to the balance sheet. He became an activist, projecting his own image and that of the cooperative far beyond the dollars and cents aspects of marketing." *Waldbaum v. Greenbelt Consumer Services, Inc.*, Civ. No. 76–1810, at 12 (D.D.C. Feb. 15, 1979) (memorandum and order granting Fairchild's motion for summary judgment), *reprinted in* App. at 150, 161. Given Greenbelt's prominence, his activities certainly extended beyond those of a profit-maximizing manager of a single firm.

Thus, it would appear to a reasonable person that Waldbaum had thrust himself into the public controversies concerning unit pricing, open dating, the cooperative form of business, and other issues. He did so in an attempt to influence the policies of firms in the supermarket industry and merchandising generally. In the process, he assumed the risk that comment in the press might turn to the successfulness or profitability of enterprises under his management, for the commercial success or failure of the actions he was advocating certainly is strong evidence in the public debate over whether other firms should adopt them. Furthermore, Waldbaum had prior dealings with the media. See App. at 44–46, 62–67 (deposition of Waldbaum) (descriptions of dealings with the press). Although he personally was not frequently the subject of articles, he was somewhat familiar with press operations and had held press conferences to discuss Greenbelt's policies and op-

erations. Looking at the overall picture, we conclude that Waldbaum was a public figure for the limited purpose of comment on Greenbelt's—and his own—innovation policies and that the article giving rise to this action was within the protected sphere of reporting. Because Fairchild concededly did not act with "actual malice," it was entitled to summary judgment.

V.

Not everyone who participates in activities that affect the public becomes a public figure. Nevertheless, when one assumes a position of great influence within a specific area and uses that influence to advocate and practice controversial policies that substantially affect others, he becomes a public figure for that debate. Waldbaum was such a person, and comment on his termination as president and chief executive officer of Greenbelt falls within the range of reports protected under *New York Times*. Therefore, the judgment of the district court is

*Affirmed.*

---

responsibilities of a position may include decisionmaking that affects significantly one or more public controversies, in which case the occupant becomes a limited public figure for those controversies. Courts should avoid generalizing, however, for labelling certain positions as always being public is tantamount to making subject-matter classifications, forbid-

den under the case law. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979); *Time, Inc. v. Firestone*, 424 U.S. 448, 456, 96 S.Ct. 958, 966, 47 L.Ed.2d 154 (1976). Courts therefore must undertake the analysis outlined above in each case.