**John B. CLYBURN, Plaintiff,**

v.

**NEWS WORLD COMMUNICATIONS, INC., et al., Defendants.**

**Civ. A. No. 86–1149.**

United States District Court, District of Columbia.

Jan. 27, 1989.

See also 117 F.R.D. 1.

Milton Heller, J. Philip Kessel, Washington, D.C., for plaintiff.

Allen V. Farber, Washington, D.C., for defendants.

### MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

This is a libel action against the Washington Times (Times). Plaintiff is seeking compensatory and punitive damages for defamation and for intentional infliction of emotional distress. Presently before the Court are defendants' motion for summary judgment and plaintiff's motion for partial summary judgment on the issue of falsity. The Court held a hearing on these motions on January 23, 1989.

The complaint is based on a series of four news articles and one editorial which appeared in the Washington Times beginning on April 7, 1986.[1] These articles and the editorial state that plaintiff and former and current high-ranking District of Columbia officials were present at the time of Joann T. Medina's collapse from a drug overdose on December 10, 1983. Medina died four days later in the hospital. The Times also stated that Medina "lay unconscious on the bathroom floor for several critical hours—while those at the party fled —before an ambulance was called." Washington Times, April 7, 1986.

Defendants argue that summary judgment is appropriate because plaintiff is a limited purpose public figure and is unable to meet his burden of showing clear and convincing evidence that defendants acted

---

**1.** The news articles appeared on April 7, 22, 24 and 25, 1986; the editorial appeared on April 23, 1986.

with actual malice. Even if the Court finds that plaintiff is not a public figure, defendants argue, plaintiff still cannot show by a preponderance of the evidence that defendants were negligent. Further, defendants contend that plaintiff cannot prove falsity, that the editorial is a constitutionally protected statement of opinion, and that plaintiff has failed to produce any evidence supporting his claim for intentional infliction of emotional distress.

Plaintiff, on the other hand, argues that he is not a public figure and that there is sufficient evidence from which a reasonable jury could find both negligence (to recover compensatory damages) and actual malice (to recover punitive damages). Plaintiff also argues that the editorial contained unprotected defamatory statements of fact and that defendants are not entitled to summary judgment on his allegation of intentional infliction of emotional distress.

For the reasons given below, the Court grants the motion of defendants for summary judgment. Plaintiff's motion for partial summary judgment on falsity is denied as moot.

### FACTS

In February 1986, the Times formed a team of reporters to investigate possible corruption in the D.C. government. The investigation related, in part, to alleged irregularities in the awarding of city contracts and to involvement with illegal drugs among D.C. officials. Reporters Michael Hedges, Jerry Seper, and Robert Welch were assigned to the team. Assistant Managing Editor Theodore J. Agres served as the immediate supervisor.

According to defendants, early in the investigation, John Clyburn's name surfaced as a contractor with the D.C. government who was also a friend of Mayor Marion Barry. The reporters sought information from potential sources about any possible irregularity in Clyburn's contracting with the city, and other activity of public concern, according to the Times. Clyburn was a founder and co-owner of a consulting firm, the Granville Corporation (later named D.I.S.C.) that had obtained several city contracts.

Several sources contacted by the Times mentioned Clyburn's presence at the scene of Joann Medina's collapse on December 10, 1983, at 1325 North Capitol Street, N.E., Washington, D.C. Medina collapsed and later died as a result of having ingested substantial amounts of alcohol and illegal drugs on the night of December 9–10, 1983. Clyburn found Medina unconscious in the bathroom at 1325 North Capitol St. on December 10. Medina died on December 14 at Washington Hospital Center. An autopsy and toxicology report found that Medina's body contained substantial amounts of barbiturates, cocaine, and alcohol.

According to the Times, the investigation of Clyburn and his relation to Medina's death revealed several irregularities that led them to believe that an area of legitimate public interest was involved. These irregularities included:

(1) When the reporters contacted the Metropolitan Police, a police spokesperson incorrectly stated that Medina had collapsed at her home in Maryland and not in the District of Columbia.

(2) The Washington Post reported that Dr. Douglas Dixon, acting chief medical examiner for the District of Columbia at the time of Medina's death, had stated that political pressure was improperly applied to him to change Medina's death certificate.

(3) Articles in the Post and in the Times in 1984 revealed that Clyburn had misrepresented the identity of the person who telephoned the 911 emergency number on December 10, 1983, to assist Medina. Clyburn claimed that he made the call, but official records show that a woman (whom Clyburn now states is Linda Mason) made the call.

(4) The Times and the Post reported in August 1984 that federal authorities were investigating Medina's death. The Times states that reporters learned that the FBI, DEA, and Metropolitan Police investigated Medina's death as part of an

investigation into possible use of illicit drugs by Mayor Barry.

At the time of Medina's collapse, Clyburn was involved in an extramarital affair with Medina and was aware of Medina's use of cocaine during this period.

Clyburn spoke to a reporter for the Post about Medina's collapse and death for a news article published on August 11, 1984, headlined "Death Probed After Autopsy Was Changed." In that article, the Post reported that the U.S. Attorney's office was investigating the circumstances of Medina's death and the alteration of her autopsy. The autopsy report originally ruled Medina's death a suicide, but this was changed to "undetermined causes." Washington Post, Aug. 8, 1984.

Clyburn stated in the article that he and Medina went to a Georgetown night club and to the Washington Convention Center before going to 1325 North Capitol, where Medina ultimately was found unconscious. Clyburn stated that he and Medina were alone when they went to sleep about 1 a.m. Around 8 a.m., Clyburn found Medina in the bathroom and called the 911 emergency number, according to the article. Clyburn now admits that another woman, Linda Mason, was present in the house and that she called the 911 emergency number. Clyburn also stated in the Post article that he "might have suggested to Medina's father that he call [Director of D.C. Department of Human Services David] Rivers to try to change the medical examiner's ruling from suicide, but [Clyburn] said he never talked with Rivers about the case." *Id.* Clyburn's name appeared in at least four Times news articles in 1984 in connection with Medina's collapse and death.

The articles and editorial at issue in this case were published by the Times in April 1986. The sources of information for these articles included five confidential sources, identified as A, B, 1, 2, and 3. Three of the confidential sources were law enforcement officers, one was an assistant United States attorney, and one was a D.C. government employee. The Times asserts that its reporters and editor were satisfied that these sources were reliable and that the information they provided was accurate.

In summary, according to the Times, all five confidential sources confirmed that Medina collapsed at a party on December 9–10, 1983, at 1325 North Capitol, at which former and then current high-ranking officials of the D.C. government were present. Two confidential sources (source B and source 2) stated that those at the party had delayed calling for emergency medical assistance for Medina until most of them could leave. One confidential source, source 2, said that the delay lasted several hours.

As plaintiff points out, confidential sources B and 2 (the sources that stated that a delay occurred in calling for medical assistance) relied on their review of summaries of witnesses to Medina's collapse. Thus, the sources' information is not based on personal knowledge. Plaintiff also asserts that the confidential sources did not know the identities of the informants and were thus not in a position to assess the veracity and accuracy of the informants' witness summaries. Moreover, the assertion that a delay of "several hours" occurred was based on information provided by only one confidential source—source 2.

Another, non-confidential, source that the Times relied upon was Michael Wheeler, a former D.C. school security employee. Plaintiff contends that his unprinted charges against Mayor Barry raised obvious reasons for doubting his credibility. The Times notes that the essential information provided by Wheeler—about a party attended by city officials and a delay in calling for help—was borne out during further investigation.

In sum, plaintiff's claim involves four articles and one editorial printed in the Times in April 1986. Plaintiff has identified the defamatory statements as those asserting that plaintiff and former and current high-ranking D.C. officials were present at the time of Medina's collapse and delayed calling for an ambulance "for several critical hours" as "Ms. Medina lay unconscious on the bathroom floor." Washington Times, April 7, 1986. These

facts present two critical legal issues: one, whether Clyburn was a public figure, and two, whether there is sufficient evidence to support a jury finding that the Times is liable under the applicable standard of care.

## DISCUSSION

### A. Standard for Summary Judgment.

In deciding a motion for summary judgment, the Court must apply the same evidentiary standard of proof that would apply at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (holding that "the judge must view the evidence presented through the prism of the substantive evidentiary burden"). Therefore, if Clyburn were a limited purpose public figure, the standard articulated in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964),[2] applies. The appropriate summary judgment question under this standard is whether the evidence in the record could support a reasonable jury finding that the plaintiff has shown actual malice by clear and convincing evidence. *Liberty Lobby*, 477 U.S. at 255–56, 106 S.Ct. at 2513–14. Where the heightened evidentiary standard of *New York Times* does not apply—for example, where the plaintiff is not a public figure—summary judgment is appropriate when the record will not support a jury finding of negligence by a preponderance of the evidence.

Regardless of the applicable evidentiary standard for summary judgment, Rule 56(e) requires that a party opposing a summary judgment motion set forth specific facts showing there is a genuine issue for trial. To defeat the motion, the nonmoving party must present enough evidence so that a jury might find in its favor. *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. at 2515.

### B. Clyburn Was a Limited Purpose Public Figure.

The Court must determine, as a matter of law, whether plaintiff was a private individual or a limited purpose public figure.[3] To show that plaintiff is a limited purpose public figure, defendants must satisfy three criteria. They must show that: (1) a public controversy existed on a specific question having ramifications for non-participants; (2) the plaintiff had a significant role in the controversy, either by voluntarily attempting to affect the outcome or by being drawn into the controversy and assuming a central role; and (3) the alleged defamation was germane to plaintiff's participation in the controversy. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296–98 (D.C.Cir.) *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *Dameron v. Washington Magazine*, 779 F.2d 736 (D.C.Cir.1985) (modifying *Waldbaum* to allow for involuntary limited purpose public figures under narrow conditions). In resolving this issue, the court should ask "what a reasonable person, looking at the entire situation, would conclude...." *Waldbaum*, 627 F.2d at 1294.

The parties contest the scope of the public controversy over Medina's death and the nature of Clyburn's role in the controversy. Plaintiff argues that the controversy at issue involved only whether or not Medina's death certificate had been improperly amended as a result of political pressure. Defendants claim that the controver-

2. In *New York Times,* the Court held that, in a libel suit brought by a public official, the first amendment requires the plaintiff to show "with convincing clarity" that in publishing the defamatory statement the defendant acted with actual malice—that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726.

3. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court described two types of public figures to whom the *New York Times* actual malice standard applies: all purpose public figures, and limited purpose public figures. An all purpose, or general, public figure has achieved "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id.* at 351, 94 S.Ct. at 3013. A limited purpose public figure either "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* Defendants claim that Clyburn is a limited purpose public figure.

sy involved both the circumstances of Medina's death (for instance, how she obtained the cocaine) and "the larger question of corruption in the District government." Defendants' Memo at 32.

Clyburn also challenges defendants' claim that he sought and achieved a central role in the controversy. Defendants argue that plaintiff attempted to influence the outcome of the controversy through his access to the media, primarily his statements to a Post reporter for the August 11, 1984, article. Further, defendants' contend that Clyburn's close association with Medina and D.C. officials placed him at the center of the controversy. Plaintiff, on the other hand, argues that he was at most a trivial participant in the aspect of Medina's death that actually became part of a public controversy: the alteration of her death certificate.

### 1. The Public Controversy

Turning first to the scope of the public controversy over Medina's death, the Court finds that this controversy involved more than simply an inquiry into the changing of Medina's death certificate. Rather, the controversy extended to the circumstances of Medina's death and ongoing allegations of drug use among city officials. As the Washington Post first reported on August 11, 1984, the U.S. Attorney's office was "trying to determine how Medina died and how she obtained the cocaine found in her blood." In that article, Clyburn stated that he was with Medina the night she collapsed, and that they had gone together to the row house at 1325 North Capitol Street.

Subsequent articles appearing in the Times in August and September 1984 reported that federal agents were investigating reports that D.C. government officials were present at a party at the row house where Medina collapsed. These articles indicated that Medina's association with city officials and their possible presence on the night of her collapse raised questions as to drug use and corruption among city officials. These circumstances were also considered amid reports that David E. Rivers, director of the D.C. Department of Health

and Human Services, pressured the medical examiner's office to change the cause of death in Medina's case. Finally, the Times associated the circumstances of Medina's death with inquiries into Mayor Barry's connection to Karen Johnson, who had been convicted of drug-related offenses.

█ The Court recognizes that a public controversy in the defamation context must involve more than simply a matter of public interest. As *Waldbaum* held, a public controversy must be a "real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum*, 627 F.2d at 1296. Further, publishers cannot create a public controversy with a defamatory publication. Courts "must look to what already were disputes." *Id.* at 1297.

The controversy involving the circumstances of Medina's death satisfies these requirements. A real dispute existed as to the circumstances surrounding Medina's death. Medina's collapse raised legitimate questions involving the presence of illegal drugs, the alteration of her autopsy report, and the possibility that city officials were present the night she collapsed. Clyburn concedes that "investigators from the FBI, DEA and D.C. Police Department had conducted a wide-ranging investigation into the circumstances of Ms. Medina's collapse and death in order to determine if Mayor Barry, or other D.C. officials had been involved in drug usage at that time." Plaintiff's Memo at 39. These issues affected the general public, and clearly "had foreseeable and substantial ramifications for non-participants." *Waldbaum*, 627 F.2d at 1297.

Further, the controversy existed prior to the publication of the allegedly defamatory articles. The controversy began with the Washington Post article published August 11, 1984, and continued with the publication of the Times' articles in August and September 1984.

### 2. Clyburn's Role in the Controversy

Second, after analyzing Clyburn's role in the controversy, the Court concludes that he was a central figure in the circumstanc-

es surrounding Medina's death and that he purposely attempted to influence the outcome of the investigation into her death. Clyburn clearly played a central role in the events leading up to Medina's death. He admitted that he was with Medina on the night of December 9–10, 1983, and Clyburn stated that he found her unconscious in the bathroom the next morning.

More importantly, Clyburn attempted to affect the outcome of the public inquiry into Medina's death. He made incorrect statements to the Washington Post and to DEA, indicating that he and Medina were alone when they went to sleep on December 10, 1983, and that he placed the 911 call. The nature of the false information suggests that Clyburn was trying to conceal the fact that at least one other person was present on the night at issue. The presence of another person is clearly relevant to the broader controversy over Medina's death, which involved where Medina obtained the illegal drugs and whether others were present on the night she collapsed. Thus, while Clyburn did not seek out the press or DEA, he did volunteer information that he now admits was false. These actions demonstrate that Clyburn attempted to influence the course of the controversy described above.

Finally, the alleged defamation was clearly germane to Clyburn's participation in the controversy. The statements at issue assert that a party, involving city officials, occurred on the night of Medina's collapse and that there was a delay in calling for an ambulance. These statements are related to Clyburn's presence in the row house with Medina on December 9–10, 1983, and his subsequent statements to the press and to investigators. For these reasons, then, the Court concludes that Clyburn was a limited purpose public figure.

## C. Plaintiff's Evidence of Actual Malice is Insufficient.

■ As a limited purpose public figure, Clyburn is required by the first amendment to prove actual malice by clear and convincing evidence. *New York Times v. Sullivan*, 376 U.S. 254, 280, 285–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964). Actual malice is defined as publishing a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280, 84 S.Ct. at 726. To survive summary judgment, plaintiff must adduce sufficient evidence for a jury to reasonably find that plaintiff clearly and convincingly proved defendants acted with actual malice.

■ The Supreme Court has held that the standard for actual malice is subjective: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).[4] The court must look to the defendant's own actions and statements, the nature of defendant's sources, and other circumstantial evidence to determine whether defendant entertained a "high degree of awareness of ... probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964); *see also Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1293 (D.C.Cir.1988). The court must focus on the publisher's subjective belief in the truth or falsity of his or her statements. *Pearce v. E.F. Hutton Group, Inc.*, 664 F.Supp. 1490, 1511 (D.D.C.1987).

Plaintiff's evidence of actual malice can be grouped into two categories, both of which involve the nature of defendants' sources for the allegedly defamatory articles. First, plaintiff asserts that defendants had obvious reasons for doubting the veracity and accuracy of the confidential sources. Plaintiff maintains that confiden-

---

4. The Court elaborated: "Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies." *St. Amant,* 390 U.S. at 731–32, 88 S.Ct. at 1326.

tial sources B and 2 were not in a position to assess the truth of their informants' statements and that these confidential sources did not know the identities of the informants. Plaintiff also argues that the accounts of the confidential sources are contradictory as to the "delay" in calling for medical assistance. Further, plaintiff takes issue with the failure of the confidential sources to name the city officials present when Medina collapsed. These factors, according to plaintiff, provided the Times with obvious reasons to doubt the reliability of the confidential sources and, therefore, the truth of the articles at issue.

Second, plaintiff argues that Michael Wheeler's statements to Times' reporters raised serious doubts concerning his veracity and accuracy. The notes of the Times' reporters who interviewed Wheeler reveal that he made several derogatory remarks concerning Mayor Barry, which plaintiff argues undermined his credibility. Plaintiff also asserts that the Times fabricated portions of Wheeler's quotes.

After reviewing the evidence and the relevant case law, the Court concludes that there is insufficient evidence for a jury reasonably to conclude with convincing clarity that defendants published with actual malice. This conclusion is based on several considerations. First, the record reveals no direct evidence concerning defendants' own statements or actions that supports a finding of actual malice. Defendants stated that the editors and reporters involved in the publication of the articles did not have any subjective doubt about the truth of what they reported. Defendants' Statement of Material Facts at para. 17 (citing affidavits).

### 1. Confidential Sources

■ Second, defendants reliance on the confidential sources, who, in turn, relied on informants, does not indicate actual malice. Of the five confidential sources, three were law enforcement officers, one was an assistant U.S. attorney, and one was a D.C. government employee. All five sources provided consistent information indicating, in sum, that Medina collapsed at a party on December 9–10, 1983, at which city officials were present.

Source B and source 2 stated that a delay occurred in calling for an ambulance; only source 2 stated that this delay lasted several hours, as the Times reported. Sources B and 2, both law enforcement officers, based their information on summaries of witness interviews. Therefore, although sources B and 2 did not have personal knowledge that a delay occurred, they were trained in assessing the reliability of information provided by informants. According to defendants, the Times' reporters believed that sources B and 2 knew the identities of the informants, because the only witness summaries that the reporters saw (in an unrelated case) included such information. Even if the sources did not know the identities of the informants in the witness summaries, and the reporters were aware of that fact, the credibility of the information provided in the summaries would be bolstered by the sources' inherent reliability and experience as law enforcement officials.

■ Moreover, reliance on a single source does not indicate actual malice, *New York Times v. Connor*, 365 F.2d 567, 576 (5th Cir.1966), especially where the source has no apparent motive for misleading the reporters. Also, none of the other sources contradicted the assertion that a delay of several hours occurred. In fact, the possibility that a delay occurred is supported by the testimony of D.C. Fire Lt. David Godfrey, which indicated that Medina had been unconscious for "a long time."

■ Finally, the evidence regarding city officials' attendance at the party did not raise reasons to doubt the confidential sources. Names of city officials in attendance were provided by three of the confidential sources. The fact that the Times did not print the names of the officials alleged to be present when Medina collapsed does not suggest actual malice. The Times could simply have determined that several officials were present, but that there was insufficient information to print the names of the officials.

### 2. Michael Wheeler

While Wheeler made several outrageous statements to Times' reporters, the perti-

nent information he provided about the circumstances of Medina's collapse was corroborated by confidential sources. Wheeler' statements indicated that Medina collapsed at a party, which included city officials, and that there was a delay in calling for help. This information was consistent with information obtained from confidential sources. Further, the Times' reporters believed Wheeler to be a reliable source, because he had provided information on a prior occasion.

■ Plaintiff argues that inconsistencies between Wheeler's quotes in the Times and his subsequent testimony is evidence of actual malice, because they show that the Times fabricated the quotes. Defendants explain these inconsistencies, in part, by suggesting that Wheeler's memory was affected when he suffered a stroke. Careful review of the record indicates that the alleged inconsistencies are not clear enough to warrant the conclusion that defendants fabricated the quotes. Generally, Wheeler's deposition testimony suggests that he did not remember what he stated to Times' reporters. Further, the inconsistencies relate to minor points in the articles at issue.

In sum, plaintiff's circumstantial evidence involving the nature of defendants' sources does not sufficiently demonstrate that the Times, in fact, seriously doubted the truth of the allegedly defamatory articles. There were no obvious reasons to doubt the veracity or the accuracy of the salient information provided by the confidential sources or by Michael Wheeler. *St. Amant v. Thompson*, 390 U.S. at 732, 88 S.Ct. at 1326 ("recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports"). Therefore, the Court finds that the record is inadequate to permit the conclusion—by clear and convincing evidence—that defendants acted with actual malice. Accordingly, summary judgment for the defendants is appropriate on plaintiff's claim for libel.

*D. Intentional Infliction of Emotional Distress Claim.*

■ Defendants are also entitled to summary judgment on plaintiff's claim for intentional infliction of emotional distress. Following the Supreme Court's holding in *Hustler v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), Clyburn, as a limited purpose public figure, must prove actual malice to recover for the tort of intentional infliction of emotional distress. *Id.* 108 S.Ct. at 882. Thus, in accordance with the Court's conclusion that the evidence is insufficient to permit a finding of actual malice on the facts in this case, defendant's motion for summary judgment is granted on count III of the complaint.

### CONCLUSION

The Court concludes that plaintiff is a limited purpose public figure, and that he has failed to present sufficient evidence to allow a reasonable jury to find actual malice by clear and convincing evidence. Therefore, summary judgment for defendants is warranted on the libel claim and the intentional infliction of emotional distress claim. Plaintiff's motion for partial summary judgment on the issue of falsity is denied as moot.