**METASTORM, INC., Plaintiff,**

v.

**GARTNER GROUP, INC., Defendant.**

**No. Civ.A. 97–0979(SS).**

United States District Court,
District of Columbia.

Dec. 4, 1998.

Alison E. Goldenberg, JoAnne Zawitoski, Semmes, Bowen & Semmes, Baltimore, MD, for Metastorm, Inc., plaintiff.

Kenneth A. Caruso, Gadi Weinreich, Christopher Guy Janney, Shaw, Pittman, Potts & Trowbridge, Washington, DC, for Gartner Group, Inc., defendant.

Robert William Hesselbacher, Jr., Semmes, Bowen & Semmes, Baltimore, MD, for Metastorm, Inc., counter-defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

■ This matter comes before the Court on the following four motions: (1) Defendant's Motion in Limine;[1] (2) Defendant's Motion for Summary Judgment; (3) Plaintiff's Motion for Summary Judgment on Count 1 of the Complaint; and (4) Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim. The relevant, undisputed, facts are set forth below.

Plaintiff, Metastorm, initiated the present action on May 7, 1997. The complaint alleges defamation, trade libel, and tortious interference with prospective economic advantage in connection with an article published by defendant, Gartner Group ("Gartner") on February 26, 1997. Gartner is a leading provider of information technology ("IT") reports and consulting services worldwide. Gartner offers its services which consist mainly of short "Research Notes" or longer "Strategic Analysis Reports" to over 28,000 individual and 7,400 organizational subscribers worldwide. Some of the information provided by Gartner is also available to members of the public via the Internet.

Metastorm is a privately owned corporation formed in September, 1996 for the express purpose of serving as a reseller of "InForms", an electronic forms product owned by Novell. The primary users of InForms consist of state and federal agencies and large private corporations and associations that process significant amounts of paper in their daily business. InForms allows such businesses to reduce or eliminate their need for paper by generating and using electronic forms.

Novell sold InForms directly and indirectly through various resellers from 1994 until the fall of 1996. On November 8, 1996 Novell entered into a technology and marketing agreement ("the Agreement") with Metastorm. Under the terms of the Agreement Novell retained ownership and control of InForms while Metastorm became primarily responsible for the future development, manufacturing, distribution, marketing, sales and support of the product. On December 19, 1996 Novell issued a press release announcing the Agreement, summarizing its terms

---

1. This Court will analyze Defendant's Motion in Limine as if it were a motion for summary judgment as motions for summary judgment routinely are used to determine the appropriate standard of fault in a defamation case. *See e.g. Clyburn v. News World Communications, Inc.,* 705 F.Supp. 635 (D.D.C.).

and listing the benefits of the Agreement for InForms' users. Metastorm participated in the preparation of the press release by reviewing a draft prior to its publication. The press release was distributed domestically and internationally to industry analysts and specialized trade publications. It was also posted on Metastorm's World Wide Website and that of its subsidiary, Elite Federal Forms. Gartner contends members of the news and press wire services also received copies of the press release.

Gartner received a copy of the press release on December 20, 1996 and again on January 3, 1997. Regina Casonato ("Casonato"), a leading analyst on information technology at Gartner, reviewed the press release. Casonato contacted Novell and inquired about the financial capabilities of Metastorm in preparation for drafting a preliminary Research Note ("Note"). The initial version of the Note included the statement that Novell had quit the E-form market. Casonato sent a copy of the draft Note to Sadrine Leroux ("Leroux"), a Public Relations employee with Novell, U.K. for comment. Leroux forwarded the draft to Peter Joseph, marketing manager at Novell, U.K. who marked up the draft and faxed his edited version back to Casonato. Specifically, Joseph noted that Novell had not quit the electronic forms market and that Novell would continue to support Informs customers up to and including the release of the next Informs version in early 1997. While Casonato made some changes to her draft Note based on Joseph's comments, she did not change the statement that Novell had quit the E-forms market. She then sent a copy of her revised draft Note to her supervisor, Steve Wendler, ("Wendler") at Gartner. Mr. Wendler sent Casonato's Note back with a number of suggestions. Most importantly, Wendler advised Casonato to "treat Metastorm harshly" for not providing Gartner with data as to its financial status.[2] Casonato again made changes to her Note based on Wendler's comments and suggestions.

Gartner published Casonato's Note on February 26, 1997. The Note contained the following ten statements which Metastorm maintains constitute actionable defamation:

1. "The transfer of the InForms product from Novell to Metastorm means the virtual death of the product. Users of InForms should immediately begin planning migration to alternative products".

2. "Novell's support for InForms will cease by [the second half of] [19]98. (0.7 probability)."

3. "Through 1999, Metastorm will be unable to invest enough in InForms to maintain competitive IEFM functionality (0.8 probability)."

4. "Novell has quit the market for integrated E-form management ."

5. "Significant investment is needed to keep InForms competitive against leading electronic form vendors. At this point it is not clear where Metastorm will get the money for that effort. (e.g. JetForm [a competitor] has more than 100 research and development people dedicated to E-form development)."

6. "It does not appear that Metastorm will have enough profit from current operations to provide the investments needed".

7. "This announcement with Novell creates a significant problem for InForms' users (especially outside the United States) in the short term. Novell is promising it will continue to support InForms customers up to and including InForms 4.11 but it lacks a focused strategy. Novell's support for InForms will cease by [the second half of] [19]98 (0.7 probability)."

8. "Metastorm is a small company with no presence outside the U .S. government market and no clear financial sources for the investments needed to

2. In preparing her report Casonato requested certain financial data from Metastorm which is a non public corporation. Metastorm declined to provide such information. If in fact Metastorm was "treated harshly" or otherwise punished for not supplying financial information such action or actions would certainly go to the issue of Gartner's intent.

stay competitive in the IEFM market."

9. "Metastorm will work to expand new markets but its size, dependency on Novell-centric environments and strong competition will limit its growth."

10. "Bottom Line: InForms is dead. All users should consider alternatives (e.g., dedicated systems such as Jet-Form or E–Form components embedded in workgroup/intranet)."

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law identifies which facts are material. Only disputes over facts that might affect the outcome of the suit will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine dispute about a material fact exists, all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505. If the moving party demonstrates that no genuine issue of material fact exists the non-moving party must show, by specific factual allegations, the existence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265. (1986).

### II. Standard of Fault

■ Current First Amendment defamation jurisprudence represents the culmination of various attempts by the courts over the years to fashion an appropriate test that recognizes the competing interests of the state, the individual, and the Constitutional guarantee of freedom of the press. The Supreme Court clearly recognized a special privilege for the press in the landmark case of *New York Times v. Sullivan,* 376 U.S. 254,

84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There, the Court held libel liability does not arise in cases brought by public officials against print media absent a showing of actual malice, i.e., that the statement was made with knowledge that it was false, or with reckless disregard of its truth or falsity. The Court noted the need to protect the "uninhibited, robust, and wide-open" debate on public issues. *Id.* at 269, 84 S.Ct. 710. The Court extended the press privilege beyond public officials to include "public figures" in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The term "public figure" refers generally to those individuals who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved". *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 325, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Throughout this line of cases, the Court has focused on two issues: the status of the individual and the nature of the matter involved. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985); *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (a factor in determining the appropriate standard of fault is whether the allegedly defamatory speech concerns a matter of legitimate public interest).

■ The parties disagree as to the appropriate standard of fault to be applied in this action. Gartner contends that since Metastorm is a limited-purpose public figure, or in the alternative, that the statements involve matters of legitimate public interest, the more protective, actual malice standard must apply whereas Metastorm argues for the application of a negligence standard. The standard of fault in a First Amendment case is a question of law for the Court to decide. *See e.g. Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1293 n. 12 (D.C.Cir. 1980).

### A. The Limited Public Figure Test

■ Gartner contends the actual malice standard should apply because Metastorm, at

the least, is a limited-purpose public figure. This Circuit analyzes limited-purpose public figures under the three part test originally laid down in *Waldbaum;* Namely, (1) that a public controversy existed prior to the publication; (2) that the plaintiff played a sufficiently central role in the controversy; and (3) that the alleged defamatory statements were germane to the plaintiff's participation in the controversy. *Clyburn v. News World Communications,* Inc., 903 F.2d 29, 31 (D.C.Cir.1990); *Waldbaum* at 1296–98.

### i. *Public Controversy*

*Waldbaum* defines a public controversy as a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. *Waldbaum* at 1296.

■ There can be no doubt that a public controversy existed prior to the release of Gartner's article. The issuance of the press release brought the Novell–Metastorm Agreement to the attention of members of the IT industry and specialized trade publications, if not members of other media as well. Indeed, at least one other article about the Agreement preceded Casonato's Note.[3] Furthermore, it is apparent the Agreement had ramifications for others beyond Gartner, Novell and Metastorm. The broad client base of electronic forms users could certainly be affected if Metastorm were unable to market successfully Informs or otherwise fails to fulfill the terms of its Agreement.

### ii. *Metastorm's Role in the Controversy*

The second prong of *Waldbaum* asks whether the plaintiff "could realistically have been expected, because of its position in the controversy, to have an impact on the resolution". *Waldbaum* at 1297. Metastorm contends it did not attempt to initiate or influence public debate about the Agreement merely by participating in the preparation of the press release. Metastorm argues Novell essentially issued the press release on its own.

Metastorm's conduct, even accepting its version of the facts as true, rises to the level of significant participation in the controversy.

If Metastorm did not intend to influence public debate by assisting in the preparation of the press release, it is reasonable to expect that the issuance of a press release will create public debate. The second prong of *Waldbaum* is met.

### iii. *The article was germane to Metastorm's Participation in the Controversy*

The third prong of *Waldbaum* requires the alleged defamation be germane to the plaintiff's participation in the controversy. *Waldbaum* at 1297. Casonato's article in this case not only refers to the Agreement between Novell and Metastorm, but directly refutes statements made in the press release. There can be no question that the article is germane to Metastorm's participation in the controversy.

### B. *The Martin Marietta Test*

■ In *Martin Marietta* Judge Flannery had before him the issue of what standard of fault should apply to a corporation alleging defamation against a member of the mass media. Martin *Marietta Corp. v. Evening Star Newspaper,* 417 F.Supp. 947, 955–956 (D.D.C.1976). There, the court held that the actual malice standard applies in a defamation case brought by a corporation against a member of the mass media where the publication in issue concerned matters of legitimate public interest. *Id.* at 956. Corporations, Judge Flannery reasoned, do not require the same substantial protections afforded natural persons because they generally do not suffer the same harm. Specifically, injury to a corporation's reputation, as opposed to that of a natural person, does not involve "the essential dignity and worth of every human being". *Martin Marietta* at 955. Accordingly, Judge Flannery adopted an actual malice standard. Applying this standard requires the plaintiff to prove by clear and convincing evidence that the defendant published the statement or statements "with knowledge that it was false or with reckless disregard of whether it was false or not". *New York Times v. Sullivan,*

**3.** *See* January 13, 1997 article in *Communica-* *tions Weekly,* Gart.Mem.Mot. In Lim., Exhibit 10.

376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

### i. *Gartner is a member of the mass media*

■ Metastorm contends Gartner is not a member of the mass media. In support of this position Metastorm relies on the fact that Gartner's services are available only on a subscription basis at a rate of $19,000 per year and on its assertion that only a limited number of Gartner's clients actually received a copy of Casonato's Note. Gartner, for its part, points to a number of facts in support of its position. First, Gartner contends it has over 28,000 individual clients and more than 7,400 organizational clients worldwide. Indeed, Metastorm's President, Jim Weeks, stated that "many entities, both public and private, base their buying decisions on reports issued by Gartner". Weeks Dep. At 359:6–361:7. Gartner's services are disseminated over a variety of print and electronic media forms including e-mail and the World Wide Web. It is undisputed Gartner is a leading supplier of IT news.

Based on these facts, this Court concludes Gartner is a member of the mass media.

### ii. *Casonato's Note Involved Matters of Legitimate Public Interest*

■ This Circuit has defined legitimate public interest broadly. *See Washington v. Smith,* 80 F.3d 555, 556 (D.C.Cir.) (comments about a basketball coach's performance were matters of public concern). This is in keeping with First Amendment jurisprudence which long has recognized that matters of public concern exceed the purely political. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). There can be no doubt that Casonato's article about the Agreement constituted a matter of legitimate public interest. The public is increasingly dependent upon information technology and the large corporations that dominate the IT world. Moreover, thousands of corporations and government agencies rely on Informs in the daily operation of their businesses. Given both the general public interest in the subject matter of the Agreement and the specialized interest of those who regularly rely on Informs, the Court finds the Agree-ment constituted a matter of legitimate public interest.

The Defendant having successfully met all three prongs of the Martin Marietta test, actual malice is the appropriate standard of fault to be applied in this case.

### III. *Motion for Summary Judgment and Counterclaim*

■ Both parties filed motions for summary judgment on the issue of whether Gartner's publication defamed Metastorm. Metastorm has also moved for summary judgment on Gartner's counterclaim alleging defamation in connection with Metastorm's public announcement of the current lawsuit. A genuine dispute of material facts exists with respect to these motions that precludes the entry of summary judgment. Therefore, this Court must deny both plaintiff's and defendant's Motions for Summary Judgment and Metastorm's motions for Summary Judgment on Defendant's Counterclaim.

### CONCLUSION

Freedom of the press is constitutionally protected with few limitations. The various approaches taken over the years by the courts have resulted in a First Amendment doctrine highly protective of the media and deferential to the Constitutionally recognized value of free and unfettered debate on public issues. In today's competitive high-tech era the interest of the public in accurate and complete information on IT products and companies is particularly salient. Consumers must be able to ascertain whether the products they are purchasing are supported by a stable, financially sound company. Otherwise, they risk the significant financial and administrative burden associated with altering the operation of their electronic workplace. Knowledge of high-tech companies is particularly critical due to the ease with which new companies enter and often leave the industry. The likelihood that new under capitalized entrants into the business world will not survive is real.

While it is clear the media must have a right to be wrong, there must be a limit to how wrong they can be. Where the media acts with knowledge that they are falsifying

information or where they act recklessly or irresponsibly they then exceed the extraordinarily liberal protections afforded by the Constitution.[4] The media, if it is going to remain vibrant, must report its stories straight. In the present case, while the plaintiff would prefer a negligence standard, it has informed this Court it is prepared to meet the actual malice standard. Based upon the facts as set forth in the complaint the plaintiff certainly should be given the opportunity to go forward. The defendant is entitled to the "New York Times" privilege under either the Martin Marietta or Waldbaum tests. Accordingly, Gartner's Motion in Limine will be granted. An appropriate order accompanies this memorandum opinion.

## ORDER

For the reasons set forth in the accompanying opinion, it is hereby

**ORDERED** that Defendant's Motion in Limine is **GRANTED;** and it is

**FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on Count 1 of the Complaint is **DENIED;** and it is

**FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **DENIED;** and it is

**FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim is **DENIED.**

4. The recent revelations about reporters fabricating stories underscore the need for careful public review and scrutiny of the media. Indeed, Content, a new magazine, was founded to specifically address these and other controversial issues concerning the news media.