IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 4, 2023 Session

FILED
07/03/2024
Clerk of the
Appellate Courts

# BILL CHARLES v. DONNA MCQUEEN

**Appeal by Permission from the Court of Appeals
Chancery Court for Williamson County
No. 21CV-50119     Michael Binkley, Judge**

_____

**No. M2021-00878-SC-R11-CV**

_____

Ordinarily, a plaintiff asserting a defamation claim must prove that the defendant made a false statement and did so negligently. If the plaintiff is a public figure, however, he must prove that the statement was made with actual malice. This is a steep hill to climb, so determining whether the plaintiff is a public figure is a crucial inquiry in any defamation case. This case is no exception. The plaintiff here, Bill Charles, assisted with the development of the Durham Farms community in Hendersonville, Tennessee, and is president of its homeowners' association. Charles brought defamation and false light claims against Donna McQueen, a Durham Farms resident who posted a Google review that was critical of him. McQueen sought dismissal of Charles's claims under the Tennessee Public Participation Act, arguing that Charles could not establish a prima facie case for his claims because he could not prove actual malice. The trial court agreed with McQueen and dismissed the claims. The Court of Appeals reversed in part. It agreed with McQueen that Charles had to prove actual malice to prevail on his false light claim and had failed to do so. But it held that Charles is not a public figure and therefore need not prove actual malice for his defamation claim. We disagree with the Court of Appeals on that score. We hold that Charles is a limited-purpose public figure given the voluntary and prominent role he played in a controversy concerning changes to the Durham Farms development plan. We further hold that Charles failed to establish a prima facie case of actual malice. Finally, we reject Charles's argument that McQueen waived her request for appellate attorney's fees by failing to list it as an issue in her Court of Appeals brief. We reverse the Court of Appeals in part and affirm in part, and we remand for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Affirmed in Part and Reversed in Part; Remanded to the Trial Court**

SARAH K. CAMPBELL, J., delivered the opinion of the court, in which HOLLY KIRBY, C.J., JEFFREY S. BIVINS, ROGER A. PAGE, and DWIGHT E. TARWATER, JJ., joined.

Ronald G. Harris, William J. Harbison II, and William T. Ramsey, Nashville, Tennessee, for the appellant, Donna McQueen.

Paul J. Krog, Eugene N. Bulso Jr., Eric W. Smith, and Nicholas W. Tsiouvaras, Brentwood, Tennessee, for the appellee, Bill Charles.

**OPINION**

I.

To set the scene for the factual and procedural history of this case, we first introduce the legal framework that governs defamation and false light actions in Tennessee. The relevant framework here includes the Tennessee Public Participation Act and protections for the freedom of speech and press in the United States and Tennessee Constitutions.

A.

The Tennessee Public Participation Act ("TPPA") was enacted in 2019 and is Tennessee's version of an anti-SLAPP statute. Tennessee Public Participation Act, ch. 185, §§ 1–2, 2019 Tenn. Pub. Acts 455–57 (codified at Tenn. Code Ann. §§ 20-17-101 to -110 (2021)). The acronym "SLAPP" stands for strategic lawsuits against public participation. The primary aim of a SLAPP is not to prevail on the merits, but rather to chill the speech of the defendant by subjecting him or her to costly and otherwise burdensome litigation. *See* 2 Rodney A. Smolla, *Law of Defamation* § 9:107 (2d ed.), Westlaw (database updated May 2024); *Nandigam Neurology, PLC v. Beavers*, 639 S.W.3d 651, 658 (Tenn. Ct. App. 2021). Because SLAPPs threaten to interfere with the exercise of constitutionally protected rights, more than twenty states have adopted anti-SLAPP statutes to protect defendants "from the often punishing process of defending" such suits. Smolla, *supra*, § 9:107.

The TPPA attempts to strike a balance between two competing interests. On the one hand, it seeks to "encourage and safeguard the constitutional rights of persons to petition, to speak freely, to associate freely, and to participate in government to the fullest extent permitted by law." Tenn. Code Ann. § 20-17-102. "[A]t the same time," it also seeks to "protect the rights of persons to file meritorious lawsuits for demonstrable injury." *Id.*

Like many other anti-SLAPP statutes, the TPPA establishes a procedure for swift dismissal of non-meritorious claims. The defendant in a SLAPP suit may file a petition to dismiss the action within sixty days of service of the action or "at any later time that the court deems proper." *Id.* § 20-17-104(a)–(b).

Courts engage in a two-step analysis to rule on a TPPA petition. First, the court determines whether the petitioner has made a prima facie case that the challenged lawsuit "is based on, relates to, or is in response to [the petitioner's] exercise of the right to free speech, right to petition, or right of association." *Id.* § 20-17-105(a). If the petitioner has not made this showing, the court denies the petition. *See id.* § 20-17-105(b). But if the petitioner succeeds at the first step, the court next determines whether the respondent has

made a prima facie case for each essential element of his claim. *Id.* If the respondent meets this burden, the court must deny the petition unless "the petitioning party establishes a valid defense to the claims in the legal action." *Id.* § 20-17-105(b)–(c). Otherwise, the court must grant the petition and dismiss the suit with prejudice. *Id.* § 20-17-105(e).

The filing of a TPPA petition immediately stays discovery in the pending lawsuit until the court has ruled on the petition. *Id.* § 20-17-104(d). But "[t]he court may allow specified and limited discovery relevant to the petition upon a showing of good cause." *Id.* In ruling on a petition, a court may consider "supporting and opposing sworn affidavits stating admissible evidence" and "admissible evidence presented by the parties." *Id.* § 20-17-105(d). A court's ruling on a TPPA petition is immediately appealable. *Id.* § 20-17-106.

The TPPA also has a fee shifting provision. If a court grants a TPPA petition for dismissal, it "shall award" the petitioner "[c]ourt costs, reasonable attorney's fees, discretionary costs, and other expenses incurred in filing and prevailing upon the petition" along with "[a]ny additional relief, including sanctions, that the court determines necessary to deter repetition of the conduct by the party who brought the legal action or by others similarly situated." *Id.* § 20-17-107(a)(1)–(2). Conversely, if a court finds that a petition was frivolous or solely dilatory, the court may award to the respondent costs and fees incurred to oppose the petition. *Id.* § 20-17-107(b).

B.

At the founding, defamatory statements enjoyed no constitutional protection. *Herbert v. Lando*, 441 U.S. 153, 158 (1979); *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952); *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 415 (Tenn. 1978); *see also* Robert C. Post, *The Social Foundations of Defamation Law: Reputation and the Constitution*, 74 Calif. L. Rev. 691, 721 (1986). That changed in 1964 when the United States Supreme Court decided *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

In *Sullivan*, the Court held that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–280. The Court explained that "erroneous statement is inevitable in free debate" and "must be protected if the freedoms of expression are to have" sufficient "'breathing space.'" *Id.* at 271–72 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). The actual malice standard provides this necessary breathing space, the Court reasoned, by ensuring that "would-be critics of official conduct" will not be "deterred from voicing their criticism," either because of doubt about whether they can prove the truth of their speech or the "expense of having to do so." *Id.* at 279.

Although the actual malice standard initially applied only in actions involving speech critical of the official conduct of *public officials*, the United States Supreme Court later extended the standard to speech critical of *public figures*, including private individuals with prominent roles in public controversies. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342–43 (1974); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967). Our Court has held that the Tennessee Constitution's protections for free speech and press likewise require an actual malice standard for defamation actions involving speech critical of public officials or public figures. *See Press, Inc. v. Verran*, 569 S.W.2d 435, 441–42 (Tenn. 1978) (interpreting Article I, Section 19, of the Tennessee Constitution to require an actual malice standard).[1]

Private individuals, by contrast, need only show that allegedly false statements were made negligently to recover in a defamation action. *Nichols*, 569 S.W.2d at 417–18. The United States Supreme Court explained the rationale for these different standards in *Gertz*. It reasoned that "[p]rivate individuals are . . . more vulnerable to injury" from defamatory statements than public officials or public figures because they have less "access to the channels of effective communication" and fewer "opportunit[ies] to counteract false statements." *Gertz*, 418 U.S. at 344; *see also Verran*, 569 S.W.2d at 439. Moreover, a private individual has not "relinquished . . . his interest in the protection of his own good name" by becoming a public official or public figure and therefore is "more deserving of recovery." *Gertz*, 418 U.S. at 345; *see also Verran*, 569 S.W.2d at 439.

A slightly different framework applies to false light claims. Our Court has held that false light plaintiffs must satisfy the actual malice standard in two situations: (1) when the plaintiff is a public official or public figure; or (2) when the speech at issue is related to a matter of public concern. *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 647 (Tenn. 2001). When the false light plaintiff is a private individual and the speech at issue relates only to a matter of private concern, the negligence standard applies. *Id.* at 647–48.

II.

A.

Durham Farms is a planned community in Hendersonville, Tennessee, with more than one thousand residential units. Durham Farms residents enjoy amenities like hiking trails, gathering spaces, a swimming pool, and a café.

A Boston company called Freehold Communities developed Durham Farms. Freehold hired Bill Charles, a local real estate professional who provides consulting

---

[1] In *Verran*, we suggested that Article I, Section 19, of the Tennessee Constitution is "substantially stronger" than the First Amendment. 569 S.W.2d at 442. Because McQueen has not argued that the Tennessee Constitution provides greater protection for her speech than the federal Constitution, we do not consider that issue here.

services to developers, to assist with the development. Charles is the owner and president of Land Management Group, Inc. His corporation assists clients "with real estate acquisition, helps identify high-quality business partners to provide construction and engineering services, and provides property management services." Charles's work for his real estate clients includes "dealing with contractors" and "communicating with local governmental authorities."

Charles serves as the president and registered agent of the Durham Farms homeowners' association. In his role as homeowners' association president, Charles leads meetings of the homeowners' association. When changes are made to the Durham Farms master development plan, Charles "deliver[s] the message" to residents and explains how the changes would benefit the community. Charles communicates with government officials on Freehold's behalf and has worked with the city over the years to implement the Durham Farms development plan.

Donna McQueen is a resident of Durham Farms. When she bought her home in 2017, the Durham Farms development plan specified the number of residential lots in the development, required estate-sized lots, and did not allow "rental only" units. McQueen bought her home in Durham Farms at least in part because she believed these restrictions would protect her property value.

In 2019, Durham Farms sought approval from the City of Hendersonville to amend its master plan by decreasing the minimum lot size in one section of the development. Charles hosted a meeting with Durham Farms residents to discuss the proposed change. He told residents that the change would speed up sales of the lots and benefit the community. The City ultimately approved the zoning change after holding a public meeting. According to McQueen, the lot-size amendment was a "major change that didn't sit well with [her] or other Durham Farms residents."

In September 2020, Durham Farms announced a plan to amend the community's master development plan to add over 160 "rental only" units. This announcement sent residents into an uproar, prompting some to join a Facebook group called "Help Stop Developer's New 'Rental Only' Section in Durham Farms!" Among other things, the group's page urged members to "e-mail the developer Bill Charles directly telling him you disapprove of the rental section."

McQueen discussed the proposed rental-only units with Hendersonville Alderman Eddie Roberson. Roberson told her that Charles attended a meeting with city officials regarding the rental-unit proposal. McQueen's conversation with Roberson led her to believe that Charles supported the proposal. Roberson also told McQueen that the City of Hendersonville opposed the proposal.

Nine members of the Hendersonville Board of Mayor and Aldermen soon sponsored a resolution formally expressing opposition to the proposal. The Board unanimously approved that resolution at a public meeting on September 22, 2020, after hearing from concerned residents of Durham Farms and neighboring communities. The Board was also presented with a petition containing "680 signatures from residents of Durham [F]arms and neighboring communities." Local media reported on the Board's consideration of the petition and resolution and described positions on both sides of the debate.

Charles acknowledged facilitating two private meetings between Freehold and city officials regarding the rental-unit program. But he maintains that he privately opposed Freehold's decision to allow rental units in Durham Farms. He also claims that he did not "participate in any substantive discussion of the rental unit issue" at the meetings he facilitated.

In September 2020, several residents of Durham Farms wrote negative Google reviews on Freehold's Nashville regional office page. Nearly all of the reviews denounced the rental-unit proposal. But many also complained about other recent changes to the Durham Farms development plan and accused Freehold of caring more about profits than its residents. For example, one reviewer wrote that Freehold had "changed the [Durham Farms] community plans multiple times and . . . decided to move forward with changing a high end community into a rental community despite having an overwhelming negative response from homeowners." Another wrote that "Freehold ha[d] changed [its] 'master plan' for [the Durham Farms] community [twice] in the last [two] years with 95% disapproval from the residents who live [t]here, all of [Hendersonville's] aldermen, and [Hendersonville's] mayor."

McQueen wrote one of the Google reviews. Hers was the only one that mentioned Charles by name. In full, her review read:

> Buyer Beware! Freehold Communities is nothing but bait and switch. I have lived here three years with multiple changes to our development which is supposed to be all about community and connectedness. Bill Charles, especially, uses misleading tactics to lure in home buyers only to deceive them. A rental section within our community is not what any of us signed up for. Zero star rating for Freehold.

Charles declined to comment on the rental-unit program at the next Durham Farms homeowners' association meeting. And McQueen was not aware of any public statement by Charles regarding the addition of rental units to Durham Farms.

McQueen had lived in Durham Farms for about three years before this case was filed. During that time, she attended two or three homeowners' association meetings that Charles led. After one of those meetings, she had a conversation with Charles about the

delayed opening of the amenity center. Although McQueen did not often interact directly with Charles, she saw him as "the public face of Freehold" because he led meetings with the residents and presented "all the changes" to the development plan.

Charles did not sell McQueen her home, and McQueen lacked any personal knowledge that Charles sold homes to other Durham Farms residents or made any representations to them during the sales process. But McQueen testified that the Durham Farms sales center showcased the community's development plan to recruit prospective residents. Because Charles was responsible for communicating with residents about the development plan, McQueen believed that Charles was "part of the strategy and development" of Durham Farms and "very involved in the decision-making process" when the development plan was changed. McQueen had also "read in the news that [Charles] ha[d] been working toward delivering th[e] master plan with the City for years."

B.

In January 2021, about four months after McQueen's Google review, Charles sued McQueen in Williamson County Chancery Court. His complaint asserted claims for defamation and false light. Charles especially took issue with McQueen's accusation that he "uses misleading tactics to lure in home buyers only to deceive them."

McQueen filed a petition under the TPPA seeking to dismiss Charles's claims. In support of her petition, McQueen attached eighteen documentary exhibits, including, among other things, a declaration from McQueen, newspaper articles, website screenshots, and minutes from meetings of the Hendersonville Regional Planning Commission. Charles objected to all of the exhibits except McQueen's declaration, arguing that they contained inadmissible hearsay, were unauthenticated, or both. The trial court declined to exclude the exhibits.

On the merits, the trial court granted McQueen's petition and dismissed Charles's claims. The court concluded that Charles's lawsuit was filed in response to McQueen's speech regarding a matter of public concern. That conclusion shifted the burden to Charles to establish a prima facie case for his defamation and false light claims.

The trial court held that Charles failed to make out a prima facie case for either claim. The court defined the scope of the relevant public controversy as the development of Durham Farms generally, not just the addition of rental-only units. It determined that Charles was a limited-purpose public figure with respect to this controversy and that he had not carried his burden of proving that McQueen wrote her review with actual malice. Accordingly, the court awarded McQueen her attorney's fees and costs under the TPPA's fee-shifting provision.

The Court of Appeals reversed in part. *Charles v. McQueen*, No. M2021-00878-COA-R3-CV, 2022 WL 4490980, at *13 (Tenn. Ct. App. Sept. 28, 2022), *perm. app. granted*, (Tenn. Mar. 9, 2023). On appeal, Charles renewed his objections to twelve of the exhibits attached to McQueen's petition and asserted that the trial court abused its discretion by failing to exclude them. The Court of Appeals addressed Charles's objections to seven of the exhibits and held that the trial court's failure to exclude them was an abuse of discretion. *Id.* at *4–8. The court reasoned that a court considering a TPPA petition may rely only on "admissible evidence," and the exhibits at issue were not admissible because they either were not properly authenticated or contained hearsay. *Id.* at *5–8 (quoting Tenn. Code Ann. § 20-17-105(d)). "[I]n the interest of efficiency," the Court of Appeals did not address Charles's objections to exhibits that were not "actually relied upon by the trial court in its order granting" McQueen's TPPA petition. *Id.* at *4.

The Court of Appeals then reversed the trial court's conclusion that Charles was a public figure, reasoning that it was "entirely predicated upon evidence that should not have been considered." *Id.* at *9. The Court of Appeals therefore applied the negligence standard to Charles's defamation claim rather than the actual malice standard that the trial court had used. *Id.* at *10–11. Applying the negligence standard, the court held that Charles had established a prima facie case for his defamation claim. *Id.* at *11. By contrast, the court determined that the actual malice standard applied to Charles's false light claim since McQueen's review involved a matter of public concern. *Id.* Because the court found no evidence of actual malice in the record, it held that Charles did not establish a prima facie case for his false light claim. *Id.* at *12. The court also held that McQueen had waived her request for attorney's fees incurred on appeal because the request was included in the body of her Court of Appeals brief but not presented in her statement of issues. *Id.* at *2 n.1.

McQueen filed a petition for rehearing. As relevant here, the petition argued that the Court of Appeals overlooked other admissible evidence that supported the trial court's conclusion that Charles was a limited-purpose public figure. The Court of Appeals disagreed and denied the petition. It clarified that the public controversy at issue was the "proposed rental section in Durham Farms" and that there was "simply an absence of sufficient evidence to conclude that [Charles] is a limited-purpose public figure regarding this issue."

We granted McQueen's application for permission to appeal. *Charles v. McQueen*, No. M2021-00878-SC-R11-CV, 2023 WL 2470285, at *1 (Tenn. Mar. 9, 2023).

III.

This appeal presents three issues: (1) whether Charles is a limited-purpose public figure; (2) whether Charles established a prima facie case that McQueen's allegedly defamatory statement was made with actual malice; and (3) whether McQueen waived her

request for attorney's fees on appeal.[2] We review each of these legal issues de novo. *See Ferguson v. Union City Daily Messenger, Inc.*, 845 S.W.2d 162, 166 (Tenn. 1992) (public figure status); *Tomlinson v. Kelley*, 969 S.W.2d 402, 405 (Tenn. Ct. App. 1997) (sufficient evidence of actual malice); *Jackson v. Burrell*, 602 S.W.3d 340, 344 (Tenn. 2020) (waiver).

McQueen does not challenge the Court of Appeals' evidentiary rulings in this appeal.[3] She instead contends that "[t]here is ample *admissible* evidence in the record to support the trial court's finding" that Charles is a public figure. Accordingly, in deciding the legal issues presented, we consider only two categories of exhibits: (1) exhibits that Charles attached to his opposition to McQueen's TPPA petition; and (2) exhibits to McQueen's TPPA petition that Charles did not challenge in the Court of Appeals.[4] More precisely, we consider Charles's declaration; the Master Declaration of Protective Covenants, Conditions, and Restrictions for Durham Farms; a screenshot of McQueen's allegedly defamatory statement; a screenshot of Google reviews of Freehold's regional office; a transcript of McQueen's deposition; McQueen's declaration; a screenshot of the Facebook group; a *Tennessean* article dated September 15, 2020; and *Hendersonville Standard* articles dated September 18, 2020, and October 2, 2020.

McQueen urges us to take judicial notice of YouTube videos purportedly depicting Charles and Hendersonville residents speaking at public meetings. But she raised her judicial notice argument only in footnotes. Arguments raised only in footnotes are waived. *See Fisher v. Hargett*, 604 S.W.3d 381, 388–89 n.6 (Tenn. 2020) (citing *Hodge v. Craig*, 382 S.W.3d 325, 334–35 (Tenn. 2012)); *see also, e.g.*, *Commonwealth v. Vick*, 910 N.E.2d 339, 353 n.15 (Mass. 2009) ("[A]rguments relegated to a footnote do not rise to the level of appellate argument."); *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 60–61 n.17 (1st Cir. 1999) (similar); *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (similar). Accordingly, we decline to consider this issue.

---

[2] McQueen also argues that her review was non-defamatory as a matter of law, and Charles contends in response that McQueen waived that argument. Because we conclude that Charles failed to establish a prima facie case for his defamation and false light claims, we need not reach those issues.

[3] Because McQueen does not challenge the Court of Appeals' evidentiary rulings in this Court, those issues are not before us, and we take no position on them.

[4] As noted above, the Court of Appeals did not address all of Charles's objections to McQueen's exhibits. Because our legal analysis does not rely on the exhibits the Court of Appeals declined to address, we need not consider those objections in the first instance. Any evidentiary objections that were not raised in the trial court and preserved in the Court of Appeals are waived. *See, e.g.*, *State v. Bristol*, 654 S.W.3d 917, 925 (Tenn. 2022).

A.

We first address whether Charles is a public figure.[5] The Court of Appeals defined the relevant public controversy as the addition of rental units to Durham Farms and concluded that Charles was not a public figure with respect to that controversy. We define the public controversy more broadly to include both the rental-unit proposal and the other recent changes to the development plan, and we hold that Charles was a limited-purpose public figure in that controversy.

1.

There are three kinds of public figures: general purpose, limited purpose, and involuntary. *Gertz*, 418 U.S. at 351; *Verran*, 569 S.W.2d at 439–41. General-purpose public figures are those who have achieved "such pervasive fame or notoriety that [they] become[] a public figure for all purposes and in all contexts." *Gertz*, 418 U.S. at 351. As the D.C. Circuit puts it, general-purpose public figures are celebrities or household names. *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980). Limited-purpose public figures include those who have voluntarily "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Verran,* 569 S.W.2d at 439 (quoting *Gertz*, 418 U.S. at 345); *see also Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 293 (Tenn. Ct. App. 2007), *abrogated on other grounds*, *Burke v. Sparta Newspapers, Inc.*, 592 S.W.3d 116, 123 (Tenn. 2019). Involuntary public figures, by contrast, enter public controversies against their will. They become public figures "through no purposeful action of [their] own," but rather by position, proximity, or chance. *Verran*, 569 S.W.2d at 439 (quoting *Gertz*, 418 U.S. at 345); *Lewis*, 238 S.W.3d at 293.[6]

No one contends that Charles is a general-purpose public figure. That is not surprising, as "[f]ew people . . . attain the general notoriety that would make them public figures for all purposes." *Waldbaum*, 627 F.2d at 1296. McQueen instead asserts that Charles is a limited-purpose public figure.

---

[5] Charles contends that McQueen waived her argument about the scope of the public controversy by failing to specifically include that issue in her Rule 11 application for review. We disagree. McQueen's Rule 11 application asked us to review the question whether Charles is a public figure. That question fairly includes the scope of the public controversy because defining the controversy is a necessary step in determining whether someone is a public figure. Moreover, McQueen preserved that issue by arguing in both her Rule 11 application and her brief that the Court of Appeals defined the controversy too narrowly. *See, e.g.*, *Dotson v. State*, 673 S.W.3d 204, 209–10 n.2 (Tenn. 2023).

[6] Some commentators have questioned the viability of the involuntary public figure category. *See, e.g.*, Jeffrey Omar Usman, *Finding the Lost Involuntary Public Figure*, 2014 Utah L. Rev. 951, 952–53 (2014); Smolla, *supra*, § 2:33. The United States Supreme Court has not abandoned the classification, however, so we include it here.

The "first step" in determining whether an individual is a limited-purpose public figure is to define the public controversy and determine its contours. *Id.* A public controversy is a "real dispute" whose outcome "affects the general public or some segment of it in an appreciable way." *Id.* The mere fact that a dispute is newsworthy does not necessarily mean it is a public controversy. *Id.* "Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Id.* "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Id.* at 1297.

Once a court has defined the relevant public controversy, the next step is to determine whether the plaintiff is a public figure for purposes of that controversy. Our decision in *Press, Inc. v. Verran* guides our analysis of this issue. 569 S.W.2d at 437. Relying heavily on *Gertz*, we explained in *Verran* that a "critical concern" in the public-figure inquiry is "the nature and extent of the individual's participation" in the controversy. *Verran*, 569 S.W.2d at 441 (citing *Gertz*, 418 U.S. at 352). Ordinarily, someone becomes a public figure by "voluntarily inject[ing]" or "thrust[ing] [himself] to the forefront of [a] particular public controvers[y] . . . to influence the resolution of the issues involved." *Id.* at 439 (quoting *Gertz*, 418 U.S. at 344–45). Put slightly differently, a public figure's participation in the controversy is of a nature that "invite[s] attention and comment" and gives him "special prominence" in the controversy. *Id.* (quoting *Gertz*, 418 U.S. at 345, 351). Another relevant consideration is whether the individual has "access to the channels of effective communication" so that he may easily rebut or counteract defamatory statements. *Id.* (quoting *Gertz*, 418 U.S. at 344); *see also, e.g.*, *Carr v. Forbes, Inc.*, 259 F.3d 273, 280 (4th Cir. 2001) (considering whether the plaintiff had "access to channels of effective communication"); *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 530 (6th Cir. 2014) (same); *Harris v. Quadracci*, 48 F.3d 247, 251 (7th Cir. 1995) (noting that a public figure "is usually one whose status ensures easy access to the media so as to rebut defamatory statements"); *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37 (2d Cir. 1984) (considering whether the plaintiff "maintained regular and continuing access to the media").

Some courts have developed elaborate multi-factor tests to guide the public-figure inquiry. *See* Dan B. Dobbs et al.*, Dobbs' Law of Torts* § 561 (2d ed.), Westlaw (database updated Apr. 2024) (citing cases); Smolla, *supra*, § 2:23 (same). We decline to take that approach. Instead, we stress that, in determining whether a defamation plaintiff is a limited-purpose public figure, a court should focus on "the nature and extent of [the] individual's participation" in the controversy, *Verran*, 569 S.W.2d at 441 (quoting *Gertz*, 418 U.S. at 352), and consider whether the participation is of the sort that animates the United States Supreme Court's rationale for adopting the actual malice standard for public figures—that is, that public figures are less deserving of recovery for defamatory falsehoods because they have "voluntarily exposed themselves to increased risk of injury" and possess "effective opportunities for rebuttal." *Gertz*, 418 U.S. at 344–45.

- 11 -

As a number of judges and scholars have observed, the landscape has changed significantly since *Gertz* adopted the actual malice standard for public figures. *See, e.g.*, Eugene Volokh, *Cheap Speech and What it Has Done: (Greater) Equality and Its Discontents*, 54 U.C. Davis L. Rev. 2303, 2305–06 (2021); Eugene Volokh, *Cheap Speech and What It Will Do*, 104 Yale L.J. 1805, 1848 (1995); *Berisha v. Lawson*, 141 S. Ct. 2424, 2425–30 (2021) (Gorsuch, J., dissenting from the denial of certiorari). Technological advances have made it possible for "virtually anyone in this country [to] publish virtually anything for immediate consumption virtually anywhere in the world." *Berisha*, 141 S. Ct. at 2427. This "new media environment" has reduced the incentives for fact-checking and editorial oversight. *Id.* And it has at least arguably increased the number of individuals who qualify as public figures. *Id.* at 2429 (noting that "private citizens can become 'public figures' on social media overnight"). These changes may eventually prompt the United States Supreme Court to revisit *Gertz*. For now, however, *Gertz* remains the law and controls our analysis.

2.

The parties agree that a public controversy exists, but they disagree about its scope. Charles contends that the controversy relates only to the proposed addition of rental-only units and did not begin until that proposal was announced in September 2020. McQueen argues that the controversy is broader and includes multiple changes to the Durham Farms development plan.

The debate concerning the rental units easily qualifies as a public controversy. That debate garnered public attention of at least three kinds. First, it caught the attention of public officials. Members of the Hendersonville Board of Mayor and Aldermen sponsored a resolution expressing opposition to the proposal. The Board unanimously approved the resolution after hearing from residents of Durham Farms and the broader community and considering a petition signed by nearly 700 concerned citizens. Second, the proposal generated media coverage that reported both the concerns of those opposed to the proposal and Freehold's arguments in support of the proposal. The coverage was not merely about the controversy itself; it was intended to "help the public formulate [a] judgment" about the proposal. *Waldbaum*, 627 F.2d at 1297. Third, the proposal prompted many Durham Farms residents to voice their concerns on Facebook and by posting Google reviews. Although the Facebook group that formed in response to the proposal was private, Durham Farms residents were encouraged to share the page "with other D[urham] F[arms] neighbors and other neighborhoods close by" and to contact their local officials.

The controversy over the proposal to add rental-only units also had "foreseeable and substantial ramifications" for the broader Hendersonville community. *Id.* Residents of neighboring developments expressed concern "about their proximity to a large number of rental units," and non-residents were among the signatories to the petition presented to the Board of Mayor and Aldermen. One resident of a neighboring subdivision urged that

- 12 -

"[d]evelopers must be held accountable for keeping the[ir] promises" and encouraged the city to "learn from this situation and find ways to prevent [it] from happening in the future." Residents of the broader community were worried that, by allowing rental-only units, Durham Farms would set a precedent that neighboring developments would follow.

Whether the public controversy extends beyond the debate over rental units is a closer question. Media coverage of the rental-unit controversy referred to earlier changes to the Durham Farms development plan that the Board of Mayor and Aldermen had approved. And it quoted a Durham Farms homeowner expressing frustration with these changes. The homeowner complained that the changes occurred "without resident input" and identified as an example that Durham Farms had "tak[en] away larger estate homes from the community plan and add[ed] 111 smaller lots." Several of the Google reviews also mentioned other changes to the development plan that occurred in the two or three years leading up to the rental-only proposal. The reviews mentioned these changes in the course of complaining that Durham Farms has pursued profits instead of keeping its promises to residents. In her deposition, McQueen referred to the 2019 change that reduced lot sizes in a section of the community as "a major change that didn't sit well with [her] or other Durham Farms residents."

Although the rental-unit proposal lies at the core of the public controversy in this case, we agree with McQueen that the controversy should be defined more broadly. True, the predominant reason Freehold was in the public eye in September 2020 was opposition to the rental-unit proposal. But that opposition spawned a broader discussion about Freehold's repeated changes to the development plan and prompted residents to express concerns that Freehold cared more about profits than its residents. That broader debate, like the controversy over the rental-unit proposal, had foreseeable and substantial ramifications for other Hendersonville residents. Changes to the development plan could affect neighboring communities by increasing population density or creating traffic problems. And accusations that Freehold was not responsive to the concerns of its residents undoubtedly were of interest to city officials and the larger community, not to mention prospective Durham Farms residents.

In sum, we define the relevant public controversy to include both Freehold's rental-unit proposal and other recent changes to the Durham Farms development plan that prompted public criticism of Freehold.

3.

Now that we have defined the relevant public controversy, we must determine whether Charles is a limited-purpose public figure in that controversy. For three reasons, we conclude that he is.

- 13 -

*First*, Charles voluntarily injected himself into the forefront of the controversy. After Freehold hired Charles to assist with the development of Durham Farms, he served as the registered agent and president of the Durham Farms homeowners' association at all relevant times. In that role, he led homeowners' association meetings and communicated changes in the development plan to residents. For example, he led a meeting with residents in 2019 to discuss Freehold's decision to reduce lot sizes in one area of the community. He responded to residents' concerns and explained Freehold's reasons for the change. Charles also interacted with city officials regarding the Durham Farms development plan. Although Charles denies participating in any substantive discussions of the rental-unit program, he acknowledges facilitating two private meetings between Freehold and Hendersonville officials to discuss that issue. And Alderman Roberson reported to McQueen that Charles attended meetings regarding the proposal.

*Second*, Charles's involvement in the development of Durham Farms and his role in communicating changes in the development plan to residents gave him special prominence in the controversy. In the debate over Durham Farms' decision to reduce lot sizes, Charles was Freehold's primary point of contact for residents. He communicated the change to residents and explained Freehold's position on how the change would benefit the community. Charles's role in the rental-unit controversy was less visible, but the record shows that he sought to influence the debate by arranging and attending meetings between Freehold and city officials. And given his active role in the development of Durham Farms more generally, residents understandably viewed his role in the rental-unit debate as a prominent one. The Facebook group that was set up to oppose the rental units urged everyone to "email the developer Bill Charles" to "tell[] him you disapprove of the rental section."

*Third*, Charles had access to effective channels of communication that allowed him to rebut any defamatory statements. Charles's role as president of the homeowners' association gave him regular audiences with Durham Farms residents and city officials. In fact, he participated in a homeowners' association meeting in October 2020, shortly after McQueen posted her Google review, but declined to comment on the rental-unit issue. Although there is no record evidence that Charles made statements to the media, there is evidence that meetings of the Board of Mayor and Aldermen garnered media coverage. And as the "public face" of Freehold, Charles presumably had access to the media or at least could have influenced Freehold's media response.

Taken together, these considerations persuade us that Charles is a public figure for purposes of the controversy involving the rental-unit proposal at Durham Farms and earlier changes to the development plan. Charles's participation in the controversy was both voluntary and extensive. He willingly assumed a prominent role in the debates over these issues by serving as the "public face" of Freehold, leading homeowners' association meetings at which changes to the development plan were discussed, and attending and facilitating meetings with public officials concerning these issues. This prominent role

afforded Charles effective channels of communication to respond to any injurious statements. The circumstances presented here thus strongly implicate *Gertz*'s rationale.

Charles correctly points out that McQueen could not make him a public figure by drawing attention to the debates at Durham Farms through her allegedly defamatory communications. It is well settled that defendants cannot "create their own defense" to a defamation claim "by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979). The relevant public controversy and the plaintiff's active participation in that controversy instead must predate the defendant's statement. *See, e.g.*, *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 18 (1st Cir. 2011); Smolla, *supra*, §§ 2:25–26.

But McQueen has not engaged in this sort of bootstrapping. Durham Farms residents were upset about the course of the community's development before McQueen wrote her review. As soon as the rental-unit proposal was announced, Durham Farms residents created a Facebook group to voice their opposition. Eventually, McQueen joined the group. The group's information page, ostensibly authored by another resident, encouraged residents to directly contact Charles to express their disapproval of the program. Moreover, Charles had assumed a prominent role for purposes of the Durham Farms development plan well before McQueen's statement.

Charles also points out that "one cannot obtain voluntary public-figure status through reference to one's preexisting status alone." Charles maintains that, because he "deliberately kept out of" the debate concerning the rental-unit controversy, his public-figure status cannot be based on his prominent role within Durham Farms more generally.

This argument fails for a couple of reasons. First, it rests on the faulty premise that the relevant public controversy is limited to the rental-unit proposal. As explained, the controversy is broader and includes other changes to the development plan that led residents to accuse Durham Farms of caring more about profits than the community. Second, it understates Charles's role in the rental-unit controversy. Facilitating multiple meetings with city officials to discuss the rental-unit proposal hardly constitutes absenting oneself from the debate. Had Charles truly been absent from the controversy, there would have been no reason for Alderman Roberson to report his involvement to McQueen.

Our conclusion that Charles is a limited-purpose public figure is consistent with precedents from other courts involving similar circumstances. Consider *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6 (1970). The plaintiff in that case was a "prominent local real estate developer and builder" who had obtained zoning variances from the city in the past and was involved in ongoing negotiations for additional variances and the potential sale of the plaintiff's land. *Id.* at 7. The plaintiff conceded that he was a "public figure in the community." *Id.* at 8. The United States Supreme Court called this concession "clearly correct" and concluded that the plaintiff's status easily "fell within

even the most restrictive definition of a 'public figure.'" *Id.* at 8–9 (quoting *Butts*, 388 U.S. 154–55).

The plaintiff in *Carr v. Forbes, Inc.*, likewise was a prominent real estate developer. 259 F.3d at 275. The developer had managed two controversial public projects. In the first, he "voluntarily assumed a prominent public presence" that included attending public meetings and supporting the project in the local media; in the second, his role was more "behind the scenes" but still "strong and influential." *Id.* at 281. The Fourth Circuit concluded that the developer was a limited-purpose public figure because he had "voluntarily injected himself into much of the public imbroglio surrounding the[] projects" and "had access to channels of effective communication to rebut the allegations." *Id.* Notably, although the plaintiff had not been quoted in the media with respect to one of the development projects, that did not mean that he lacked effective channels of communication; the plaintiff "was a leader of the entity from which the media solicited quotes" and undoubtedly would have been quoted "if he had made himself available." *Id.* at 281–82.

At least one state appellate court has deemed a homeowners' association president a limited-purpose public figure in an analogous situation. The plaintiff in *Vice v. Kasprzak* simultaneously served as president of the homeowners' association and attorney for the developer of the community. 318 S.W.3d 1, 16 (Tex. Ct. App. 2009). The Texas Court of Appeals concluded that the plaintiff was a limited-purpose public figure in a controversy involving accusations that the plaintiff had an "improper conflict of interest" and was elevating the interests of the developer above those of homeowners. *Id.* The court noted that the controversy was covered by the local media and that the plaintiff had written a letter to the editor to present the "opposing side of the controversy." *Id.* Like the plaintiffs in these cases, Charles voluntarily assumed a leadership role that made him the "public face" of the relevant controversy. He interacted with public officials and stakeholders and had avenues to respond to criticism.

We caution that our opinion should not be read as establishing a bright-line rule that every real estate developer or every homeowners' association president is a limited-purpose public figure. The public-figure inquiry is necessarily fact specific. And the outcome of that inquiry may vary depending on the unique circumstances of each case and the nature and extent of the plaintiff's participation in the controversy at issue. Here, however, we conclude that Charles is a limited-purpose public figure for purposes of the controversy involving the rental-unit proposal and earlier changes to the Durham Farms development plan.

B.

A party seeking dismissal of an action under the TPPA has the initial burden of "making a prima facie case that [the] legal action . . . is based on, relates to, or is in response

to that party's exercise of the right to free speech, right to petition, or right of association." Tenn. Code Ann. § 20-17-105(a); *see also* Tenn. Code Ann. § 20-17-103(2)–(4) (defining, for purposes of the TPPA, the exercise of the rights of association, of free speech, and to petition). The parties do not dispute that McQueen satisfied this burden. The burden thus shifts to Charles to "establish[] a prima facie case for each essential element" of his claims. *Id.* § 20-17-105(b).

Because Charles is a limited-purpose public figure, the scienter element of his defamation claim requires him to prove by clear and convincing evidence that McQueen acted with actual malice. *See Gertz*, 418 U.S. at 342–43; *Butts*, 388 U.S. at 155; *Verran*, 569 S.W.2d at 442. Accordingly, to make out a claim for defamation, he must establish that McQueen "published a statement" about him either "with knowledge that the statement [was] false and defaming" to him or "with reckless disregard for the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999).

Charles likewise must prove actual malice as an element of his false light claim, both because he is a public figure and because the speech at issue is related to a matter of public concern. *See West*, 53 S.W.3d at 647. To prevail on his false light claim, he must prove that (1) a party gave publicity to a matter in a way that placed him in a false light; (2) "the false light in which [he] was placed would be highly offensive to a reasonable person[;]" and (3) the party "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [he] would be placed." *Id.* at 643–44 (quoting Restatement (Second) of Torts § 652E (1977)).

McQueen argues that Charles cannot make out a prima facie case for his defamation and false light claims because he cannot show that McQueen made her statement with actual malice. The parties dispute what it means to establish a "prima facie" case. Charles contends that "a 'prima facie case' under the [TPPA] is essentially the same as a showing of a genuine issue for trial on each element." McQueen, by contrast, argues that, to make out a prima facie case, Charles must establish each element of his claims "by clear and convincing evidence."

Black's Law Dictionary defines "prima facie case" as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Prima facie case*, Black's Law Dictionary 1441 (11th ed. 2019). Consistent with this definition, in at least some contexts, courts have equated a "prima facie case" to the quantum of evidence that is sufficient to survive a motion for summary judgment or a motion for directed verdict. *See, e.g.*, *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1292 (11th Cir. 2021) (holding that, to satisfy his "burden of establishing a prima facie case of personal jurisdiction," a plaintiff "must present enough evidence to withstand a motion for a directed verdict"); *Am. Cent. City, Inc. v. Joint Antelope Valley Auth.*, 807 N.W.2d 170, 183 (Neb. 2011) (defining prima facie case as "evidence [that] sufficiently establishes elements of a cause of action and, notwithstanding a motion for directed verdict

in a jury trial or a motion to dismiss in a nonjury trial, allows submission of the case to the fact finder for disposition"); *LaGrant v. Gulf & W. Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984) (holding, in an age discrimination case, that "[a] prima facie case is one where there is sufficient evidence to withstand a motion for summary judgment or for a directed verdict"). The Tennessee Court of Appeals, for example, has explained that "avoid[ing] a directed verdict under Tenn. R. Civ. P. 50" requires the non-moving party to present "enough evidence to establish at least a *prima facie* case." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (quoting *Richardson v. Miller*, 44 S.W.3d 1, 30 (Tenn. Ct. App. 2000)); *see also Pickard v. Berryman*, 142 S.W.2d 764, 769 (Tenn. Ct. App. 1939) (explaining that, in the sense in which "the phrase 'prima facie case'" was used there, it meant "merely that [the] evidence, assuming it to be true, is sufficient to prevent his suit being dismissed, as on a directed verdict, and to require the case to be submitted to the triers of fact").

To establish a "prima facie" case under the TPPA, a party must present enough evidence to allow the jury to rule in his favor on that issue. This evidence may include "sworn affidavits stating admissible evidence" and "other admissible evidence." Tenn. Code Ann. § 20-17-105(d). As is the case when a court rules on a motion for summary judgment or motion for directed verdict, the court should view the evidence in the light most favorable to the party seeking to establish the prima facie case and disregard countervailing evidence. *See, e.g.*, *Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d 267, 284 (Tenn. 2005) (summary judgment); *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995) (directed verdict).

In determining whether a rational jury could find in the party's favor on that issue, the court also must keep in mind the applicable standard of proof. Here, a jury could find in favor of Charles on the actual malice element of his defamation and false light claims only if it were to conclude that Charles had established that element by clear and convincing evidence. *Cf. Sanford v. Waugh & Co.*, 328 S.W.3d 836, 848 (Tenn. 2010) (explaining that, because punitive damages require proof by clear and convincing evidence, in reviewing a motion for directed verdict on punitive damages, "a court must determine whether there is sufficient evidence, using the clear and convincing evidence standard, to submit the punitive damage claim to the jury" (quoting *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 207 (Tenn. Ct. App. 2008))).

Actual malice requires proof that a statement was made with knowledge it was false and defamatory or with reckless disregard for the truth of the statement. *Verran*, 569 S.W.2d at 442 (quoting Restatement (Second) of Torts § 580A (1977)). The evidence must indicate that the defendant "entertained serious doubts" about the truth of her publication. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). A speaker's failure to thoroughly investigate a claim, without more, does not establish actual malice. *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 74–75 (Tenn. Ct. App. 1986). But evidence the speaker

purposefully avoided learning whether her allegations were true is evidence of actual malice. *Harte–Hanks*, 491 U.S. at 692. Actual malice can also be established by showing that the statement was "so inherently improbable that only a reckless [individual] would have put [it] in circulation." *St. Amant*, 390 U.S. at 732.

Evidence is clear and convincing when "there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Furlough v. Spherion Atl. Workforce, LLC*, 397 S.W.3d 114, 128 (Tenn. 2013) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). This is a demanding burden. *Id.* The evidence "must produce a firm belief or conviction in the fact finder's mind about the truth of the facts to be established." *In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

Although the Court of Appeals held that Charles need not prove actual malice with respect to his defamation claim, it applied the actual malice standard when evaluating Charles's false light claim and concluded that Charles had not established a prima facie case. We agree with that conclusion.

Charles's actual malice argument focuses on McQueen's statement that Charles "uses misleading tactics to lure in home buyers only to deceive them." Charles acknowledges that the test for actual malice is subjective and that McQueen testified that she believed her statement to be true. But he contends that such testimony does not preclude a finding of actual malice when the objective facts surrounding the statement cast doubt on its credibility. He maintains that McQueen's statement was a "fabrication" that was "inherently improbable" because it lacked any factual basis. He points out that Charles did not sell McQueen her home, that McQueen had no knowledge that Charles sold homes to any Durham Farms residents, and that McQueen could only speculate that Charles was involved in creating the Durham Farms development plan or related marketing materials.

Charles's argument ignores other objective facts that could provide a reasonable basis for McQueen's subjective belief that her statement was true. McQueen testified that the Durham Farms development plan featured prominently in the sales office, that Charles was the individual who communicated with residents about the development plan, and that she had read news reports that Charles had worked with the city for years to deliver the development plan. Moreover, other Durham Farms residents echoed McQueen's belief that Freehold had engaged in "bait and switch" tactics and other deceptive practices. Although these complaints did not mention Charles by name, they support McQueen's belief that homeowners felt they had been deceived.

These facts may not affirmatively prove that McQueen's statement was true, but they provide at least some factual basis for McQueen's statement. This factual basis is sufficient to rebut the charge that the statement was a fabrication or inherently improbable. *Cf. Hunt v. Liberty Lobby*, 720 F.2d 631, 646 (11th Cir. 1983) (holding that jury could infer actual malice from inherent improbability of claim that the CIA planned to frame the

plaintiff for President John F. Kennedy's assassination). McQueen need not have unassailable proof or a specific independent source for her statement; it was enough that she could reasonably infer the basis for her statement from the surrounding circumstances. *See, e.g.*, *Tomlinson v. Kelley*, 969 S.W.2d 402, 406 (Tenn. Ct. App. 1997) ("Citizens are not required to have documentary proof in order to criticize elected officials.").

At best for Charles, the record shows that McQueen did not dutifully investigate Charles's responsibilities at Freehold before writing her review. But a failure to thoroughly investigate a claim amounts to negligence, not actual malice. *Harte–Hanks*, 491 U.S. at 692 ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." (citation omitted)); *Trigg*, 720 S.W.2d at 74–75. Although "purposeful avoidance of the truth" can support a charge of actual malice, Charles offers no evidence that McQueen deliberately ignored information that would have undermined her claim. *See Harte-Hanks*, 491 U.S. at 692.

Charles also suggests that a reasonable person in McQueen's shoes would have reached a different conclusion about Charles's role at Durham Farms. But that is not enough either. Proving actual malice requires more than showing that a reasonable person might have done things differently. *See Trigg*, 720 S.W.2d at 74–75 ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." (quoting *St. Amant*, 390 U.S. at 731))).

In short, Charles has proffered no evidence showing that McQueen had "obvious reasons to doubt the veracity" of her claims. *St. Amant*, 390 U.S. at 732. Given this lack of evidence, a jury would be unable to find, by clear and convincing evidence, that McQueen made her statement with actual malice. Charles therefore has failed to establish a prima facie case for his defamation and false light claims. Under the TPPA, his claims must be dismissed.

C.

Finally, we turn to Charles's argument that McQueen waived her request for attorney's fees. Relying primarily on *Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406 (Tenn. 2006), Charles argues that McQueen was required to include her request for fees on appeal in the statement of the issues in her Court of Appeals brief.

In *Killingsworth*, we considered whether plaintiffs bringing a claim under the Tennessee Consumer Protection Act had adequately preserved their request for statutory appellate attorney's fees by including that request only in their complaint, not their appellate pleadings. *Id.* at 410–11. We held that raising the request only in the trial court is inadequate. *Id.* Rather, "when a party is seeking attorney['s] fees incurred on an appeal, that request, absent any statute or rule directing otherwise, must be directed first to the appellate court in a timely fashion." *Id.* at 410.

We then explained exactly what the plaintiffs in that case—who were *appellants* in the Court of Appeals—had to do to adequately present and preserve their request. We noted that Tennessee Rule of Appellate Procedure 27(a)(4) "require[s] an *appellant* to set forth in his or her brief '[a] statement of the issues presented for review.'" *Id.* at 410 (emphasis added) (quoting Tenn. R. App. P. 27(a)(4) (2006)). We elaborated that "[a] claim for appellate attorney's fees is an issue that should be set before the appellate court because a remand to the trial court is not a foregone conclusion." *Id.* at 410–11. We also clarified that a request for appellate attorney's fees is a form of relief that must be stated in the brief's conclusion under Tennessee Rule of Appellate Procedure 27(a)(8). *Id.* at 411.

Because *Killingsworth* involved a request for attorney's fees by the *appellant*, it does not control the distinct issue presented here—whether an *appellee* must include a request for attorney's fees in the statement of issues of his appellate brief. To determine the answer to that question, we look to the applicable rules of appellate procedure.

Tennessee Rule of Appellate Procedure 27 sets out requirements that parties must satisfy to properly present issues and arguments to an appellate court. Tenn. R. App. P. 27. Notably, the requirements differ depending on whether the party is an appellant or appellee. *Compare* Tenn R. App. P. 27(a), *with* Tenn. R. App. P. 27(b). An appellant's brief must contain "[a] statement of the issues presented for review." Tenn. R. App. P. 27(a)(4). But an appellee need only include a statement of issues "to the extent that the presentation by the appellant is deemed unsatisfactory" or if "requesting relief from the judgment." Tenn. R. App. P. 27(b). Both parties must present arguments that detail their "contentions . . . with respect to the issues presented" with appropriate appeals to reason and authority and include a conclusion that states "the precise relief sought." Tenn. R. App. P. 27(a)(7)(A), (a)(8), (b).

*Killingsworth* establishes that all parties, whether appellants or appellees, must present a request for appellate attorney's fees to the appellate court rather than the trial court. 205 S.W.3d at 410–11. But the different requirements for the content of appellant and appellee briefs mean that appellees need not raise that request in exactly the same manner as an appellant. When a request for appellate attorney's fees does not seek relief from the judgment below, an appellee is not required to include the request in the statement of issues. Tenn. R. App. P. 27(b). But an appellee is required to present the request to the appellate court by raising it in the body of the brief, adequately developing the argument, and specifying that relief in the brief's conclusion. *See* Tenn. R. App. P. 27(a)(7)(A), (a)(8), (b).[7]

---

[7] McQueen underscores that an award of attorney's fees to the petitioning party is mandatory when a court dismisses an action under the TPPA. But the mandatory nature of a statutory attorney's fee provision does not relieve a party of the responsibility to properly present the request to the court. *Cf. Black Diamond Coal Mining Co. v. Rankin*, 98 S.W.2d 311, 312 (Tenn. 1936).

McQueen adequately presented her request for attorney's fees to the Court of Appeals. The request appears in her brief four times—in the table of contents, the summary of argument section, the argument section, and the conclusion. She also supported her request with reasoning and citations to legal authority. That was enough to preserve her request for fees on appeal. We reverse the Court of Appeals' contrary conclusion.

## CONCLUSION

In sum, we hold that Charles is a limited-purpose public figure with respect to the controversy over the Durham Farms rental-unit proposal and other recent changes to the Durham Farms development plan. We further hold that Charles did not establish a prima facie case that McQueen made her allegedly defamatory statement with actual malice. Finally, we hold that McQueen adequately presented and preserved her request for appellate attorney's fees by including that request in the argument and conclusion sections of her brief. We therefore reverse the Court of Appeals in part, affirm in part, and remand for further proceedings.

_____
SARAH K. CAMPBELL, JUSTICE